# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELIC RENEE PALLESI, | Case No. 1:13-CV-01813-SMS |
| Plaintiff, | |
| v. | ORDER REVERSING AGENCY'S DENIAL OF BENEFITS AND ORDERING REMAND FOR CALCULATION OF BENEFITS. |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | (DOC. 1) |

Plaintiff Angelic R. Pallesi by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II and for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted without oral argument to the undersigned United States Magistrate Judge.  Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") premised on legal error and not supported by substantial evidence.

## I.  PROCEDURAL HISTORY

On November 23, 2010, Plaintiff applied for disability insurance and SSI benefits.  In the application, Plaintiff alleged disability beginning September 15, 2009.  The Commissioner initially denied the claims on February 25, 2011, and upon reconsideration again denied the claims on June 16, 2011.  On July 6, 2011, Plaintiff timely filed a request for a hearing.

1

On May 22, 2012, Plaintiff appeared and testified in front of Tamia N. Gordon, Administrative Law Judge ("the ALJ").  *See* 20 C.F.R. 404.929 *et seq.*  Plaintiff was represented by counsel.  An impartial vocational expert and industrial psychologist, Alan E. Cummings ("the VE"), appeared and testified telephonically.

On May 25, 2012, the ALJ denied Plaintiff's application.  The Appeals Council denied review on September 12, 2013, thus the ALJ's decision became the Commissioner's final decision.  *See* 42 U.S.C. § 405(h).  On November 7, 2013, Plaintiff filed a complaint seeking this Court's review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## II. ADMINISTRATIVE RECORD

### A. Plaintiff's Testimony

#### 1. Hearing: May 22, 2012

At the time of the hearing, Plaintiff, born October 28, 1981, lived in an apartment with her nine-year-old son.  Plaintiff was able to communicate in English, completed high school, and had received a certificate as a "medical assistant" from a vocational college.  Plaintiff testified she was approximately five feet six inches tall, right-handed, and weighed 153 pounds.  She stated that she received general assistance, food stamps, and Medical.  Plaintiff testified that she last worked in 2009 as a fast food store manager, and her prior jobs included fast food crew member, rain gutter installer, telemarketer, canvasser, and slot-floor supervisor at a casino.  Plaintiff testified that she was not currently working and had not worked since 2009.

Plaintiff testified that her chief complaint and basis for her disability claim was her depression and anxiety.  She reported being somewhat improved because without her medications she used to have "outbursts," but these were managed by her current medications.  Plaintiff stated that her depression and anxiety, however, were not under control.  Either due to her anxiety or as a side effect of her medications, for example, her head was completely bald in the back and had been for two years.  Plaintiff testified that her treating therapist told her that it was alopecia, and that her

2

hair would likely grow back.  She was also "frightened to go outside."  She testified that her depression was worse and not improving.

Plaintiff testified that she managed her self-care.  Plaintiff reported that she was able to handle finances, and shop for food once a month for an hour.  Plaintiff stated that she was capable of light household chores such as cooking meals, shopping, basic housework, mopping, sweeping, vacuuming, and laundry.  Plaintiff testified that during a typical day she gets up at seven o'clock, prepares her son for school, walks him to school, gets home, does some light housework, watches television, generally waits for her son to get home, and when he does she helps him with his homework, cooks dinner, and they go to bed around 8 p.m.  On days when she is unable to venture outside due to anxiety, she testified that her son walks to school with his cousin, who also lives in their building.  Plaintiff testified that she did not drive and had not driven "in about a year."

Plaintiff alleged onset of disability in December 2009, reported that she has had nearly lifelong mental health issues and she had significantly declined since her infant son's death.  She explained that her depression affected her everyday life "because I'm stuck grieving."  She described effects of her anxiety that, for example, she cries so hard that she "can't breathe."  When asked what barred her from working, Plaintiff answered "my depression."  She reported that "little things" made her cry and that going out amplified her anxiety such that when she was "out somewhere away from my home," she did not feel safe.

Plaintiff complained of mental impairments.  To manage her mental health, Plaintiff reported taking multiple prescriptions over the years.  She testified that she was presently taking mirtazapine (45mg.) for depression, as well as hydroxyzine (four times per day) for anxiety, both as prescribed by her treating physician at Fresno County Department of Behavioral Health, Dr. Luu.  She reported being medication compliant.  Plaintiff testified that she saw a therapist, first once a week, and now "down to two times per month."  Plaintiff testified that, as a result of her increased anxiety, her therapist had in the prior month "bumped" her medication from "two times to four times [daily]."

3

Other than her treating physician, Plaintiff reported receiving mental health treatment at the Pathways Program and that she had seen multiple mental health professionals about her depression, anxiety, concentration, and other mental health issues.

Plaintiff testified that her depression affected her ability to focus or concentrate so that she could stay focused for only 15-20 minutes. She stated that she seldom completed tasks, if she started them at all and reported daily having three to four uncontrollable crying spells, each lasting five to ten minutes. The ALJ asked whether Plaintiff had physical limitations, to which Plaintiff responded that she had arthritis in her back and neck. Plaintiff estimated that she could walk approximately 20 minutes before needing to rest, stand for an hour before she had to sit, sit for 30 minutes at a time, and could occasionally lift approximately 30-40 pounds.

## 2. Adult Function Report

In an Adult Function Report dated January 5, 2011, Plaintiff complained of depression and anxiety. Plaintiff wrote that she took care of her then eight-year-old son and their cat. Plaintiff reported that before onset of her condition, she "was able to cope with things." After the alleged onset, she wore the same clothes "day after day sometimes," bathed twice per day, her hair had fallen out from stress, she shaved once per month, she had stopped eating for a month and had been hospitalized, and she "just gave up" when her baby died. Plaintiff wrote that if she required special reminders to take care of personal needs and grooming, her grandmother told her. Her grandmother also called her with help or reminders to take medicine. She reported that she was able to make simple meals and perform light housework such as dishes, vacuuming, dusting, laundry, and picking up, which she cumulatively performed for "3 hrs [hours] a day." She further reported that she needed help or encouragement to do those things because "I'm not very social so for me to go out someone would have to really convince me it's ok." She stated that other than caring for her son, she left the house only to go to Pathways because "the outside world scares me." She reported that she did not drive or have a license. She wrote that she shopped once per month for "about an hour."

Plaintiff reported that she could handle her finances, though not pay her bills apparently for lack of funds.  She listed her daily hobbies as "watching tv and listening to music."  She paced as she listened to music.   Plaintiff explained that her social activities were limited to going to Pathways on weekdays for three hours per day.  She tended to forget appointments.  In describing whether she had problems getting along with family, friends, neighbors, or others, she wrote, "the death of my baby caused problems."  She reported that her social activities had changed since the onset of her condition in that she no longer wanted to go outside, was "very depressed," and had anxiety.

Plaintiff listed problems with talking, hearing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others.  She wrote, "I really don't want to participate in talking or listening to people."  She estimated that she could pay attention for five to seven minutes.  She did not sleep well, was easily tired, could only concentrate for short periods, did not finish what she started, followed written instructions "not very good," and spoken instructions apparently adequately but that she would "still have to ask questions."  Plaintiff reported getting along with authority figures "not very good," though she had not ever been fired or laid from a job because of problems getting along with other people.  She reported that she experienced great difficulty handling stress or changes in routine.   She reported that she had unusual behavior or fears in that she had an unusual level of stress and anxiety illustrated by her aversion to going out in public.  Plaintiff listed her daily medications as Zoloft (150 mg, prescribed during her pregnancy), Naproxen (500 mg. twice daily, prescribed November 17, 2010), Clonidine (0.1mg. three times daily for anxiety, prescribed December 1, 2010), and Abilify (10 mg.).

### 3.  Disability Report - Appeal

In a Disability Report dated March 16, 2011, Plaintiff complained of increased depression, alleging a change in her experience as of February 2011.  She noted that her mental health care providers for the period October 2010 through March 2011 were Jaime Powers and Dr. Richard Guzzetta.  She listed her then current medications for depression as Abilify (with side effects of

5

blurry vision and dizziness) and Cymbalta (with no side effects), as well as Clonidine for anxiety (with no side effects), and naproxen for arthritis (with no side effects).  She reported no new physical or mental limitations since her last completed disability report from November 23, 2010.  She listed her current treatment for depression and anxiety as "therapy and medication."  She marked changes in her daily activities, such as "[she was] scared to come out of the house, hardly go[es] out, cannot sleep, shake all the time."  She reported that her care continued with Dr. Guzzetta at the Department of Behavioral Health.

In a Disability Report dated July 6, 2011, Plaintiff complained of increased depression and anxiety.  She reported having new mental limitations as a result of her condition, specifically, having memory problems.  She reported that she continued to get treatment for her depression and anxiety from Dr. Guzzetta at the Department of Behavioral Health.  Her then-current medications as prescribed by Dr. Guzzetta were Abilify and Mirtazapine for depression, Clonidine for anxiety, and Naproxen for back pain.  She reported that her daily activities had changed since she last completed a disability report in that she forgets "a lot of stuff," and that her grandmother helped to remind her.

**B.  Vocational Expert Testimony**

Alan E. Cummings testified telephonically as vocational expert ("VE") before the ALJ at the May 2012 hearing.  He classified Plaintiff's past relevant work as follows: telemarketer, Dictionary of Occupational Titles ("DOT") Code 299.357-014, semi-skilled, sedentary exertional level, Specific Vocational Preparation ("SVP") level 3, performed consistent with DOT; canvasser as door-to-door sales representative, DOT Code 291.357-010, unskilled, light exertional level, SVP 2, performed consistent with DOT; rain gutter worker as construction worker I, DOT Code 869.664-014, semi-skilled, heavy exertional level, SVP 4, performed consistent with DOT; slot floor supervisor as money room supervisor, DOT Code 211.137-018, skilled, light exertional level, SVP 6, but based on the record it was performed inconsistent with DOT and more appropriately coded as SVP 5 and medium to heavy exertional level (lifting 25 pounds frequently and 100 pounds occasionally); fast

food manager, DOT Code 185.137-010, light, skilled, SVP 5, performed consistent with DOT; and fast food worker, DOT Code 311.472-010, light, unskilled, SVP 2, but performed inconsistent with DOT and more appropriately coded as medium to heavy exertional level (lifting 25 pounds frequently and 100 pounds occasionally).  The VE opined that Plaintiff had no transferrable skills.

The ALJ described a hypothetical person of claimant's same age, education, and past work experience, and who possessed the residual functional capacity ("RFC") to perform simple, routine, repetitive tasks, could have only occasional interaction with the public, and had no physical limitations.  Based on these limitations, the VE testified that a similarly capable individual would not be able to perform Plaintiff's previous position as they are actually and generally performed.  The VE opined that other jobs existed in the economy which such an individual could perform.  He used three unskilled[1] jobs as examples: "packager," DOT Code 920.587-018, medium, SVP 2, with 93,000 jobs in California and 676,000 nationally; "cleaner," DOT Code 381.687-018, medium, SVP 2, with 201,000 jobs in California and two million nationally; and, "inspector," DOT Code 727.687-066, light, SVP 2, with 47,000 jobs in California and 410,000 nationally.

The ALJ posed a second hypothetical where an individual with the same age, education, and past work experience as the claimant, with no physical restrictions, had the RFC to perform work at all exertional levels, but had functional limitations due to a combination of mental impairments associated with anxiety and depression such that the individual would be unable to engage in sustained work activity for a full eight-hour work day on a regular and consistent basis.  With such limitations, the VE testified that a similarly capable individual would be precluded from all of Plaintiff's past work.  The VE further testified that a similarly capable individual would not be able

---

[1] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding, and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled work." *See* Social Security Ruling 83-10.

to perform any work available in the national economy.  The VE stated that his testimony was consistent with the DOT.

### C.  Medical Evidence

The ALJ was presented with the following medical records and opinions.  The objective medical evidence confirmed the diagnosis of severe depression and anxiety.  The medical evidence confirmed that Plaintiff received treatment for these complaints from various physicians and mental health care providers between 2010 and 2012.  Extensive mental health treatment notes from treating, non-treating, and evaluative providers exist in the record.

#### 1.  Treating Physician: Richard Guzzetta, M.D.[2]

In medical records from November 2010 through March 2011, Richard Guzzetta, M.D., made notes on Plaintiff's bi-monthly or monthly visits to the Fresno County Mental Health Plan at the Department of Behavioral Health.  During this period he reported that Plaintiff's primary complaint was depression.  In medical records from Plaintiff's November 17, 2010 visit, Dr. Guzzetta noted treatment changes: stopped Seroquel, starting Abilify (10 mg, "1/2 to 1"), increasing Zoloft to 150 mg per day, and planned follow up in four weeks.  The primary reason for the visit was Plaintiff's recent start on Seroquel.  The doctor noted that Plaintiff experienced negative side effects from the drug, including excessive sedation and weight gain.  Answering with selected answers apparently from a set of drop-down options, Dr. Guzzetta responded that Plaintiff was medication "adherent," medication side effects were "none," medication change was "none," and he answered "yes" to whether the medications were effective.  He recorded his observations in the "Mental Status Exam" section by selecting the following drop-down menu options:

1. Appearance          Well groomed
2. Behavior:           Cooperative
3. Motor activity:     Normal
4. Sensorium:          Alert
5. Cognition:          Normal

---

[2] AR 247-49; 297-303.

```
6. Speech:              Normal
7. Orientation:         Normal
8. Thought processes:   Organized
9. Thought content:     ☐ Normal
10. Mood                Normal
11. Affective Range:    Normal
12. Intelligence:       Average
13. Insight and Judgment: Normal
14. Other:              [blank]
```

Dr. Guzzetta made the following clinical diagnoses:

```
Axis I       Depression, grief reaction, cannabis abuse, alcohol abuse
Axis II      Deferred
Axis III     Vascular headaches, joint pain
Axis IV      Recent death of child, poor social support
Axis V       [GAF score] 5[3]
```

Medical records show that Plaintiff was scheduled to visit Dr. Guzzetta on December 14, 2010, but did not attend.  Despite Plaintiff's no-show at the appointment, the "Mental Status Exam" section is populated with data identical to the previous record.  All other responses remained the same as prior visits.

Plaintiff next visited Dr. Guzzetta on December 21, 2010.  In progress notes from that date, Dr. Guzzetta repeated the same observations and diagnoses as above, with identical responses.  The primary purpose of the visit was to follow up on Plaintiff's starting Clonidine.  He noted that the drug was somewhat helpful, "but she is still anxious and irritable."  Her current medications were as follows: "Ambien, Zoloft 100 [crossed out to note change] 150mg per day, MVI, Depo-Provera, Seroquel XR 50mg hs [crossed out to note change], Abilify 10 mg hs, Clonidine 0.1mg tid."  Dr. Guzzetta planned a "trial increase" of Clonidine and that he would "cut [the] dose if she feels lightheaded."  The diagnoses remained the same.

In records from January 12, 2011, Dr. Guzzetta followed up on Plaintiff's increased Clonidine.  He reported that "she is still experiencing withdrawal, but less . . . ."  He listed her

---

[3] The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) (Text Revision 4th ed. 2000) at 32.  At 5, the GAF score given here seems to be a typographical error because GAF scores given by other providers during this time frame are 50, and the parties do not acknowledge such a low score.

current medications as "~~Ambien~~, Zoloft ~~100~~ [crossed out to note change] 150mg per day, MVI, Depo-Provera, ~~Seroquel XR 50mg hs~~ [crossed out to note change], Abilify 10 mg hs, Clonidine 0.1mg tid, Naprosyn 500 bid." Dr. Guzzetta noted that Plaintiff was medication adherent, medication side effects were "none," the response to medication change was "none," and he answered "yes" to whether the medications were effective. Dr. Guzzetta's planned treatment changes as it applied to Plaintiff's medications: prescription for Trazadone (50mg #90 sig) increased from one to three, newly prescribing Keflex 500mg for ten days, and she was to return for follow up in two weeks. Again, the doctor left the "Mental Status Exam" note section blank and had no other changes on the form. The diagnoses were the same.

Plaintiff did return in two weeks, visiting Dr. Guzzetta on January 25, 2011. Dr. Guzzetta wrote that the primary reason for the visit was to follow up on Plaintiff's starting Trazadone. He reported that "it helped her sleep but felt she was more depressed, [when] she woke up she didn't want to get out of bed." He listed her current medications as "~~Ambien~~, Zoloft ~~100~~ [crossed out to note change] 150mg per day, MVI, Depo-Provera, ~~Seroquel XR 50mg hs~~ [crossed out to note change], Abilify 10 mg hs, Clonidine 0.1mg tid, Naprosyn 500 bid." All other sections on the form remained unchanged from the prior forms. The diagnoses remained the same. Plaintiff was to return in three weeks.

Records show that Plaintiff was scheduled to visit Dr. Guzzetta on March 8, 2011, 2010, but did not show. Similar to his notes on the prior no-show, the doctor left the notes in the "Mental Status Exam" section identical to the preceding visit, such that despite Plaintiff's absence, the drop-down data fields show the same responses as all previous visits. The doctor noted "No Show." He planned for "RTC [return] three weeks," and "Stop Zoloft on second week."

The next progress notes are dated March 29, 2011, when Dr. Guzzetta noted that the primary purpose of the visit was to follow up on Plaintiff's starting Cymbalta. He wrote that she experienced negative side effects on Cymbalta. He reported that Cymbalta "made her suicidal," and "she is

crying seven days a week rather than three."  He updated the list of current medications as follows: "~~Ambien~~, Zoloft ~~100~~ [crossed out to note change] 150mg per day, MVI, Depo-Provera, ~~Seroquel XR 50mg hs~~ [crossed out to note change], Abilify ~~10~~ 5 10 mg hs, Clonidine 0.1mg tid, Naprosyn 500 bid, ~~Cymbalta 60 caused SI~~ [suicidal ideations]."  Drop-down box responses in all other sections of the form remained unchanged from prior forms, as did the doctor's diagnoses.  Dr. Guzzetta planned for Plaintiff to start Remeron (30mg hs), continue Abilify, and return for follow up in three weeks.

Also on March 29, 2011, Dr. Guzzetta completed a Psychiatric/Psychological Medical Source Statement in which he answered prompts regarding Plaintiff's abilities and limitations.  The doctor opined: Plaintiff is able to relate and interact with supervisors and co-workers "when she is stabilized on medication"; "she has trouble with concentration and therefore would have trouble" understanding, remembering, and carrying out an extensive variety of technical and/or complex job instructions; she would be "able" to understand, remember and carry out simple one-or-two step job instructions; "if she is stable on meds [medications]," she would have "no problem," dealing with the public; she is not able to maintain concentration and attention for two hour increments, but is "able to focus for up to 30 minutes at a time"; she is unable to withstand the stress and pressures associated with an eight-hour work day and day-to-day work activity because she is "unable to handle stress," and "she states her hair falls out"; she is able to handle funds; the expected duration and prognosis of Plaintiff's impairments were that "symptoms may improve over time"; his estimated onset and history of the patient's impairment was "6/28/10 – when her son died"; her side effects from medication or related restriction were "none"; and as to whether Plaintiff required additional testing or evaluation, the doctor wrote, "re-evaluate in one year."

    2.  <u>Examining Orthopedic Surgeon: Theodore Georgis, Jr., M.D.</u>[4]

At the request of the state agency, consulting physician Theodore Georgis, Jr., M.D., performed an orthopedic consultation on February 17, 2011, including a thorough history and

---

[4] AR 265-69.

evaluation of Plaintiff's physical condition.  Plaintiff reported chronic neck and back pain after a 2006 car accident where she was rear-ended by a fast moving car.  She had subsequent x-rays, MRIs, and "a full workup."  She received chiropractic treatment for six weeks, but her condition declined. To treat her back pain, her then-current medication was Naproxen.  Dr. Georgis opined that Plaintiff "is a pleasant, cooperative female who is a reliable historian. Good effort with examination."  Dr. Georgis's diagnosis was "chronic neck and back pain; status post motor vehicle accident."  He listed Plaintiff's physical functional capacity as follows:

> The claimant can lift and carry 50 pounds occasionally and 20 pounds frequently.  The claimant can stand and walk six hours out of an eight hour day with normal breaks. The claimant can sit without restriction.  Exertional limitations include frequent stooping, crouching and crawling.

### 3.  Treating Therapist: Jamie L. Powers, LMFT[5]

From approximately November 2010 through May 2011, Plaintiff was under the care of Jamie L. Powers, Licensed Marriage and Family Therapist ("LMFT") and senior licensed mental health clinician at Pathways to Recovery Mental Health Track.  After each session, the LMFT produced type-written treatment notes.

Summarized here is the LMFT's comprehensive assessment based on a two hour session November 8, 2011.  The LMFT documented that Plaintiff's depression and anxiety started in June 2010, with previous bouts of depression subsequent to her father's death. The LMFT considered Plaintiff's chief complaints to be severe depression, increased appetite and significant weight gain, anhedonia, hypersomnia during the day and insomnia at night, psychomotor agitation, fatigue and loss of energy, difficulty with concentration, making decisions, and memory.  Family psychiatric history included the mother's suicide when Plaintiff was a child, and that Plaintiff's cousin had been diagnosed as schizophrenic.  As to her "past psychiatric history" the LMFT checked "denies," but also checked "inpatient psychiatric hospitalization."  The LMFT wrote, "PACT [psychiatric acute

---

[5] AR 250-56; 259-62.

care unit] about 2 yrs ago, then another time.  Also in the PHF [The Psychiatric Health Facility].

While a child, client had outpatient therapy."[6]   About Plaintiff's bio-psychosocial history, the

LMFT reported:

> Client was born and raised in Fresno, CA by her mother and father until she was ten y/o, then her grandmother and grandfather raised her. Grandparents raised her because client's mother killed herself and client's father remarried. [The stepmother] fired a gun and the shot went right over client's head. Client has one sister with whom the client does not relate well. Client graduated from school with a 3.8 gpa, she was in track, in high school she was working.

The LMFT indicated that Plaintiff had a history of neglect and abuse (molested at age seven and

raped in June 2010), domestic violence, and inadequate social support.  Plaintiff reported alcohol

abuse in the form of daily drinking from the time she was 21 until June 2010, infrequent

amphetamine use in 2005, regular daily cannabis use (with a current medical marijuana card), and

denied all other drug use.  Plaintiff reported current psychiatric medications as Seroquel and Zoloft,

and past psychiatric medications as Wellbutrin and Xanax.  Plaintiff reported insomnia, disturbed

sleep, and hypersomnia.

The LMFT noted that Plaintiff voluntarily presented for an evaluation of suicidality,

depression, neglect/abuse, alcohol/other drugs, homicidality, anxiety, family/marital, somatic

complaints, psychosis, medication, and behavioral disturbance.  The LMFT opined that Plaintiff had

a "[s]ignificant impairment," and had a "[p]robability of significant deterioration," relative to the

following symptoms:

> **Consumer's Current Clinical Symptoms/Behaviors:** (with frequency and duration)
> 1. Depressive feelings with increased appetite and wt. gain daily
> 2. Fatigue and loss of energy daily
> 3. Difficulty with concentration, making decision[s], memory daily.

---

[6] The Psychiatric Health Facility (PHF) is a 16 bed inpatient mental health facility mandated by the State of California to treat and serve the severely mentally ill adult residents of Fresno County. The PHF provides intensive services for severely mentally ill who are experiencing danger to self and/or others and gravely disabled, focusing on symptom reduction and stabilization.  *See* Fresno County Department of Behavioral Health Psychiatric Health Facility (available at http://fresno.networkofcare.org/mh/services/agency.aspx?pid=FresnoCountyDepartment ofBehavioralHealthPsychiatric HealthFacilityPHF_67_2_0 (last visited November 20, 2014).

The LMFT's treatment plan included medication support services in conjunction with Dr. Guzzetta, specialty mental health treatment, individual and group therapy, as well as individual and group rehabilitation.  The LMFT's plan objectives were to decrease Plaintiff's depressive feelings, fatigue, and loss of energy to two days per week, and to increase her ability to concentrate, make decisions, and improved memory to 5 days per week.  The LMFT's proposed discharge criterion was "when objectives have been met," and she proposed a one-year duration.  The LMFT noted that Plaintiff had anxiety and paranoia, but no suicidal or homicidal ideations.

In the LMFT's objective evaluation, she noted that Plaintiff presented with a well-groomed appearance; appeared her stated age; her height and weight were appropriate; her behavior was calm; cooperative; and within cultural norms; her speech was normal, spontaneous, elaborative, and she had no response latency; her mood was sad, depressed, and anxious; her affect was tearful and congruent; she was oriented to person, place, time, and situation; she was logical, coherent, but tangential; she had phobias and obsessions; her immediate memory recall and short-term memory were "poor"; her recent memory was "fair"; her remote/long-term memory, abstraction, and interpretation were "intact"; her judgment and general fund of information were "good"; her insight "fair";  no homicidal ideations; she was a current "low" risk for suicide because she had no current suicidal ideations despite her two past suicide attempts in 2006 (one "ingested pills," and another "cut wrists").  The LMFT opined that Plaintiff had derealization and was paranoid.  The LMFT's clinical assessment summary was that Plaintiff exhibited signs of depressive and panic disorder and had grief and loss issues related to her infant's death, "complicated bereavement," together with significant recent weight gain, anhedonia, hypersomnia during the day and insomnia at night, psychomotor agitation, fatigue and loss of energy, difficulty with concentration, memory, decision making, panic disorder, and obsessive compulsive tendencies surrounding cleanliness and rituals. The LMFT noted that Plaintiff accepted the plan as described, was already seeing Dr. Guzzetta, had a case manager, and needed individual therapy.  The LMFT diagnosed:

| **Axis I:** | 296.32 | Major Depressive d/o [disorder], rec[urrent], moderate |
| | 300.01 | Panic d/o [disorder] without Agoraphobia |
| | 300.3 | OCD |
| **Axis II:** | V71.09 | [no diagnosis] |
| **Axis III:** | | Arthritis, hernia repair |
| **Axis IV:** | | Economic, employment, primary support system, inadequate social support |
| **Axis V:** | | GAF=50[7] |

In a mental disorder short-form evaluation form dated January 7, 2011, the same senior licensed mental health clinician, the LMFT, assessed Plaintiff's mental status.  The LMFT noted that Plaintiff was then an outpatient client receiving individual therapy and assessment services. Plaintiff's current medications were Zoloft (150mg), Abilify (10mg), Clonidine (0.1mg, three times per day), and Naproxen (500mg, two times per day).  The LMFT's diagnoses remained as above. The form prompted a provider to choose a response from a list of options and then to comment on abnormal findings.  The LMFT made findings relevant to Plaintiff, summarized in the following areas: (1) Appearance and Behavior: poor hygiene, agitated motor activity, slow and soft speech, guarded behavior, aggressive behavior disturbance; (2) Sensorium and Cognitive Functioning: oriented all spheres, impaired concentration, severely impaired immediate and recent memory, average intelligence; (3) Mood and Affect: anxious, depressed, fearful, and angry mood, labile affect (commenting, "severe depression, does not shower or get dressed unless she's coming to program. Hung black sheets over windows – fearful"); (4) Perception: auditory hallucinations, but no illusions; (5) Thought Process: circumstantial associations, broadcasting content-delusions, content preoccupations such as obsessions, compulsions, and phobias; moderately impaired judgment; (6) Alcohol and Drug Abuse: the LMFT crossed out all responses and left "None," noted occasional cannabis use ("occasional cannabis use, is trying to quit use with help of meds"), no detox or drug programs.

---

[7] A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *DSM–IV* at 31-34.

In the LMFT's progress, treatment, and prognosis notes, she commented that Plaintiff attended the program daily "with few absences," and concluded that "client is processing and slowly progressing in treatment. Prognosis is poor at this time."   In the final medical source statement section, the LMFT rated[8] Plaintiff's abilities as "Poor" in all of the following areas: ability to understand, remember, and carry out complex instructions; ability to maintain concentration, attention and persistence; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; ability to respond appropriately to changes in work setting. In other areas, the LMFT opined that Plaintiff's abilities were "Fair": ability to understand, remember, and carry out simple instructions; ability to perform activities within a schedule and maintain regular attendance.

### 4.   Psychiatric Consultant: Stephen Fair, Ph.D.[9]

On February 22, 2011, state agency psychologist, Stephen Fair, Ph.D., performed a Psychiatric Review Technique (recording his conclusions on a form commonly known as a "PRTF") and a Mental Residual Functional Capacity Assessment ("MRFCA").

In the medical summary checklist on the PRTF, Dr. Fair checked a box to indicate that the relevant impairments were "severe but not expected to last 12 months."  He selected a box that the basis for his conclusion was Plaintiff's "12.04 Affective Disorders" and "12.09 Substance Addiction Disorders."  To qualify as an affective disorder, the disturbance of mood must be accompanied by a full or partial manic or depressive syndrome as evidenced by at least four characteristics of a depressive syndrome or three of a manic syndrome.  The possible characteristics of a depressive syndrome given in the "12.04 Affective Disorders" section were: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; or sleep disturbance; or

---

[8] The form defines possible ratings as: (1) Unlimited: the mental disorder does not affect the ability to perform this activity; (2) Good: the effects of the mental disorder do not significantly limit the individual from consistently and usefully performing the activity; (3) Fair: the evidence supports the conclusion that the individual's capacity to perform the activity is impaired, but the degree/extent of the impairment needs to be further described; (4) Poor: the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity.
[9] AR 270-86.

decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of

suicide; hallucinations, delusions or paranoid thinking.  Dr. Fair checked no boxes.  At the bottom of

the page, Dr. Fair checked the box for "A medically determinable impairment is present that does

not precisely satisfy the diagnostic criteria above," and stated that the disorder was "Depression;

Grief reaction."  Dr. Fair checked the same box in section 12.09 Substance Addiction Disorders, and

listed the disorder as "cannabis abuse."  Dr. Fair opined that Plaintiff had the following "B" criteria

functional limitations: "Mild" restriction of activities of daily living; but "Moderate" difficulties in

maintaining social functioning and in maintaining concentration, persistence or pace; and no

episodes of decompensation.  He listed no "C" criteria.  After briefly summarizing the evidenced he

had reviewed, Dr. Fair made the following comments:

> Credibility – partial. The claimant alleges and receives ongoing formal mh [mental health] treatment for major depression and anxiety. She began mental health treatment on 11/8/10 subsequent to her baby's death. On the last progress note, the claimant told her psychiatrist that clonidine is helping but that she remains anxious and irritable. She also takes Ambien, Zoloft, and Abilify. She also receives counseling from a marriage and family therapist. On the short form evaluation, her therapist indicated on the MSS [medical source statement] that the claimant's ability to maintain concentration, attention, and persistence, complete a normal work day and work week, and respond appropriately to changes are poor. However, the claimant has a strong work history. On the function report, the claimant is still able to perform some ADLs like taking care of her son and the household. However she does not want to go outside or participate in social activities. The evidence indicates that the claimant's impairment is currently severe. However, she only recently initiated mh tx [mental health treatment] and taking psychotropic meds. With continued mh [mental health] treatment, by 11/8/11, she will be able to perform simple routine work.

Also dated February 22, 2011, Dr. Fair completed an MRFCA form.[10]  The MRFCA is

predominately a checklist.[11]  The doctor opined that Plaintiff would be unable to sustain simple,

repetitive tasks and relate or adapt to work changes.  As to the functional area of memory and

---

[10] The mild, moderate, or severe limitations in the broad categories of "activities of daily living" that are assessed as part of the psychiatric review technique, such as maintaining social functioning, "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96–8p, *available at* 1996 WL 374184; *see also Rogers*, 490 Fed.Appx. at 17-18 (moderate impairments assessed on a psychiatric review technique form "in broad functional areas used at steps two and three" did not equate to concrete work-related limitations for RFC; rather, "the RFC assessment adequately captures restrictions in broad functional areas if it is consistent with the concrete limitations in the medical opinions.").

[11] The MRFCA checklist has five response options: Not Significantly Limited, Moderately Limited, Markedly Limited, No Evidence of Limitation in this Category, or Not Ratable on Available Evidence.

concentration, Dr. Fair checked the boxes for "Not Significantly Limited" next to the claimant's "ability to remember locations and work-like procedures, "ability to understand and remember very short and simple instructions," "ability to understand and remember detailed instructions," "ability to carry out very short and simple instructions," "ability to sustain an ordinary routine without special supervision," "ability to make simple work-related decisions," "ability to ask simple questions or request assistance," and "ability to travel in unfamiliar places or use public transportation."  Dr. Fair assessed that Plaintiff was "Moderately Limited" in her functional capacity in all of the following areas:

> SUSTAINED CONCENTRATION AND PERSISTENCE
> . . .
> The ability to carry out detailed instructions.
> The ability to maintain attention and concentration for extended periods.
> The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.
> . . .
> The ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
> . . .
> SOCIAL INTERACTION
> The ability to interact appropriately with the general public.
> The ability to accept instructions and respond appropriately to criticism from supervisors.
> The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.
> The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.
> . . .
> ADAPTATION
> The ability to respond appropriately to changes in the work setting.
> The ability to be aware of normal hazards and take appropriate precautions.
> The ability to set realistic goals or make plans independently of others.

Dr. Fair elaborated on the preceding limitations in his final functional capacity assessment:

- The [claimant's] TP [therapist] est[imated] the [claimant's] IQ to be in the ave[rage] range and she will be able to understand and remember detailed tasks.
- She will be able to persevere and concentrate on simple, routine work over an extended period of time.
- She will be able to interact appropriately with others on a limited basis.
- She will be able to adapt to changes in a simple work environment.

18

5. <u>Treating Physician: Robert Holloway, M.D.</u>[12]

In medical records from July 27, 2011, treating physician Robert Holloway, M.D., made notes on Plaintiff's visit to the Fresno County Mental Health Plan at the Department of Behavioral Health.  He reported that Plaintiff's chief complaint was medication evaluation, specifically, whether she could resume her medication.  Dr. Holloway took a complete psychiatric and medical history. Dr. Holloway reported that Plaintiff was divorced with two living children, had one deceased child, that she had been raised by her grandmother and CPS had spoken with her father before placing her with her grandmother.  Dr. Holloway noted Plaintiff's social history, writing that Plaintiff lived with her then 9-year-old son, and documented Plaintiff's history of abuse but that "[she] doesn't want to talk about it."  She did not want to answer whether she had been sexually abused.  Dr. Holloway noted that Plaintiff had been a "Straight A student."  Plaintiff was not presently in school and her education was listed as "some college for medical assistant."  Plaintiff had one juvenile arrest but no reported convictions and no history of probation or parole.

Dr. Holloway noted that Plaintiff had "Acute Episodes," of depression, including "depression at age 14 and then again this past year when her baby died June 28 [2010]."  He listed that she had prior psychiatric hospitalizations where she was in a "PAC [Psychiatric Acute Care] unit many years ago," and had a history of suicidal episodes where she "cut her wrist and ended up in a PAC unit." Her outpatient treatment in the past year included medication.  Dr. Holloway also documented Plaintiff's past medical history.  He reported that her medical problems included a "[s]eizure last week. No other problems."  To treat her medical problems, the doctor noted that Plaintiff had been prescribed Naproxen for arthritis.  Plaintiff had a previous hospitalization for hernia surgery in August 2010.  The doctor noted that Plaintiff had no head injuries, although she had a recent seizure "with loss of consciousness and loss of urinary continence."  Dr. Holloway described Plaintiff's current illness or condition as: "Sad Mood, Insomnia/Sleep, Anxiety/Panic, Hallucinations-

---

[12] AR 321-23.

Delusions, Isolation/Social Problems."  The doctor wrote extensive comments about Plaintiff's history of her present illness, as follows:

> Patient has been evaluated at Pathways and was taking Abilify 10mg and Remeron 30mg, both medications at bedtime. However, she recently had a seizure and was advised to stop taking the medication. She had an EEG done in the emergency department, but she doesn't have the results yet. Patient states she had a seizure about two weeks ago. She states she blacked out and her grandmother observed her shaking. She was urinating on herself when she came to. She denies having any injuries. She'd been on her medication for four months and found it helpful to sleep. The doctor in the emergency department couldn't advise her one way or the other as to whether she should take the medicine. She was first depressed at age 13. Her baby passed away one year ago and she started becoming more depressed again. Her sleep was poor, she was restless, couldn't remember dreams, hearing someone knock at her door. She checks the door but nothing is there. After she started the medicine she was able to sleep and wasn't as irritable. She was also able to see people more. Now that she's off she's isolating again. The seizure happened after she became dizzy. "I felt dizzy for a few seconds then blacked out," "I frequently feel dizzy and have  to sit down. That just started happening lately." She denies having chest pain or heart palpitations. No history of binging or purging.

AR 321.  As to her family medical and psychiatric history, Dr. Holloway wrote "Unknown. Mother passed away from suicide when she was 7."  Dr. Holloway listed Plaintiff's past psychiatric medications and commented as follows: Wellbutrin for depression (prescribed "several years ago after PAC admission"), Zoloft for depression ("this year" with "weight gain. Didn't help depression."), Abilify for depression ("this year" and "felt fine but had a seizure"), and Remeron for depression and insomnia ("this year" for four months, which "improved sleep").  Dr. Holloway observed the following about Plaintiff: appeared well groomed, cooperative behavior, normal motor activity, alert sensorium, normal cognition, normal speech, normal orientation, organized thought process.  Dr. Holloway commented that although Plaintiff had normal thought content, she "denies SI [suicidal ideations], HI [homicidal ideations] or VH [visual hallucinations] "but does hear someone knocking at the door."  Dr. Holloway noted that Plaintiff's mood was "Depressed, Anxious," that her "Affective Range was "Other," stating she was "tearful at times but well connected," she had "Average" intelligence with normal insight and judgment.  Dr. Holloway wrote that Plaintiff's response to medication and lab results were "improved," noting "improvement but

had a seizure."  Dr. Holloway's primary diagnosis was "Major Depressive Disorder, Recurrent, Severe with Psychotic Features."  Specifically, he diagnosed:

> **Axis I:**        296.34 Major Depressive Disorder, Recurrent, Severe with Psychotic Features
> **Axis II:**       [blank]
> **General Medical Conditions (Axis III):** [blank]
> **Other Axis III Diagnosis/Comments:** R/O Seizure disorder
> **Axis IV**:       Occupational, Economic
> **Axis V**:        [GAF] 43[13]
> **Highest Axis V in last 12 months:** [GAF] 41
> **Trauma**: Unknown

Dr. Holloway indicated his planned medication changes and basis for his medical decisions:

> The seizure is possibly due to either hypotension or from a virus or other neurological cause. She is waiting for results but her depression, agitation, social anxiety and psychosis are returning, causing her to need to restart something relatively quickly. The rates of hypotension from Abilify and Remeron are 11% and 7% respectively and Seizure are <1% and 0.1% respectively.  Based on this and the fact that depression is her primary problem, it would be reasonable to restart the Remeron now and have her wait for the results of her pending tests before starting anything else. 1) strongly advised her not to drive until she has a doctor's clearance 2) advised to stop Remeron if dizziness worsens. Continue Remeron 30mg at HS. Has Refills. Follow up at Metro in 4 weeks with her doctor as soon as possible.

### 6.   Treating Physician: Luyen Luu, M.D.[14]

Medical records from Plaintiff's treating physician Luyen Luu, M.D., cover the period August 2011 through March 2012.  Like Drs. Guzzetta and Holloway, Dr. Luu saw Plaintiff at Fresno County Mental Health Plan, Department of Behavioral Health.  Dr. Luu completed forms[15] similar to those from Dr. Guzzetta.  Rather than drop-down options, the more recent forms listed all possible responses with respective checkboxes (e.g. □ well-groomed, □ disheveled).

In medical records from Plaintiff's August 19, 2011 visit, Dr. Luu made these findings:

---

[13]  A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *DSM–IV* at 31-34.

[14] AR 312-20.

[15] Possible responses available in each category of the form are: Appearance (well groomed, disheveled, other); Behavior (cooperative, uncooperative, hostile, suspicious, withdrawn, other); Motor Activity (normal, motor retardation, excitement, hyperactive/agitated, other); Sensorium (alert, drowsy, other); Cognition (normal, pressured, dysarthric, other); Orientation (normal, person, place, time, disoriented); Thought Processes (organized, loose associations, flight of ideas, other); Thought Content (normal, delusions, ideas of reference, hallucinations, obsessions, phobias, helpless/hopeless, worthless, suicidal, homicidal, other); Mood (normal, depressed, elated, anxious, irritable, other); Affective Range (normal, labile, blunted, flat, other); Intelligence (average, below average, above average); Insight and Judgment (normal, impaired).

Referred to Metro after seeing Dr. Holloway, telepsy 7/27/2011, who told her to stop taking Abilify but continue Remeron 30mg. Was on Wellbutrin at 24yo for about one year for depression then got depressed when she lost her 6wk old 3rd child for SIDS last yr. Dr. Guzzetta put her on Remeron 30mg for 2 mths, added Abilify 10mg for augmentation for 7mths. In June, while she was sitting at home, she believes that she must have been blacked out as she "came back" after about 30sec later, finding herself urinating on self. She was able to talk normally again, but did not know what happened. Her [grandmother] described her as "jerking, like having a mini-stroke." She does not know any more info. She was not brought to the hospital but called her [primary doctor] for an appointment one week later, for amenorrhea of 3 mths and the so-called sz. Pregnancy test and EEG were normal. She was not put on anticonvulsant. Her [primary doctor] did not want to change her psy[chiatric] med[ications], so referred to see MH, hence Dr. Holloway, visit. She reports still feeling depressed, Remeron is not strong enough. Denies SI [suicidal ideations]. Denies AH [auditory hallucinations], but at times, hears her name called.

Dr. Luu's recorded observations include: appearance was "other"; cooperative behavior; alert sensorium; normal cognition, speech, orientation, thought content, mood, affective range, insight and judgment; organized thought processes; and average intelligence.  The doctor reported "no change" to Plaintiff's response to medication and lab results.  Dr. Luu opined that Plaintiff's primary diagnosis in Axis I was "major depressive disorder, recurrent, severe without psychotic features, coded 296.33.  Under Axis V, Dr. Luu opined that Plaintiff had a GAF score of 61.[16]  The doctor indicated a planned change in medication including "increase Remeron 45mg po hs," and "Ass [sic] Vistaril 25mg 1 cap bid, pm anxiety and insomnia."  The doctor planned follow up in 12 weeks.

Dr. Luu wrote in progress notes from December 30, 2011, that Plaintiff reported being "very depressed, lying on the couch [all] day long," and had thoughts of dying and self-injury in the past "but not now."  In the subjective psychiatric and social history, the doctor noted Plaintiff's history of "a couple of SA [suicide attempts]," one "cutting wrist," and another "OD on pills."  Plaintiff had been hospitalized in a psychiatric acute care unit "before," as well as "at CBHC [Community Behavioral Health Center]" for one week.  Plaintiff was presently pregnant and she planned to terminate in the near future.  Dr. Luu noted that Plaintiff's mother committed suicide "by shooting,"

---

[16] A GAF of 61–70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 31-34.

when Plaintiff was seven years old and that her father died when she was 21.  Plaintiff reported that her sister "also has depression," and is on medications.  Dr. Luu described having a discussion "about [Plaintiff's] loss, about the need to talk to someone, to have therapy . . . ."

In objective progress notes, Dr. Luu wrote that Plaintiff was not medication compliant, had sleep irregularities, and that her appetite was "not good."  Dr. Luu observed that Plaintiff was disheveled ("clean but unkempt, no make up, teary"); had depressed mood; labile affective range; motor retardation; but had normal cognition, speech, orientation, thought content, insight and judgment; cooperative behavior; alert sensorium; organized thought processes; and average intelligence.  As to Plaintiff's response to medication and lab results, Dr. Luu assessed that Plaintiff was "worse."  The doctor's primary diagnosis remained "296.33 – Major Depressive Disorder, Recurrent, Severe Without Psychotic Features."  Under Axis V, Dr. Luu opined that Plaintiff had a GAF score of 49.[17]  Plaintiff would continue with the same medication levels previously prescribed.

The next medication progress notes from Dr. Luu are dated from a visit on January 27, 2012, at which Plaintiff was accompanied by her counseling social worker, Patricia Lometti, LCSW.  Since having been medication compliant for two weeks, Plaintiff reported "feeling better," explaining that she had previously not taken her medications daily because "she had nausea and vomiting."  Plaintiff reported improved sleep, "no longer feeling depressed, not suicidal."  Plaintiff reported that she still planned to terminate her pregnancy in the near future and she understood that she could call Dr. Luu if she needed help or needed to talk to someone.  Dr. Luu reported that Plaintiff was not medication compliant.  Dr. Luu checked both "well groomed" and "disheveled" under "Appearance," making the additional comment, "appropriate."  The doctor made the following objective observations: cooperative behavior; normal motor activity, cognition, speech, orientation, thought content, mood, and affective range (commenting "brighter"), and insight and judgment; alert

---

[17] A GAF of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *DSM–IV* at 31-34.

sensorium; organized thought process; and average intelligence.  Dr. Luu's primary diagnosis remained "Axis I: 296.33 – Major Depressive Disorder, Recurrent, Severe Without Psychotic Features."  Under Axis V, Dr. Luu opined that Plaintiff had a GAF score of 55.[18]  Dr. Luu planned for Plaintiff to continue with the previously prescribed medication levels.

Dated March 23, 2012, Dr. Luu's next progress notes show Plaintiff reported "not feeling good," because she had broken up with her boyfriend.  She denied suicidal ideations.  Plaintiff complained of sleep issues and continuing high anxiety despite her current dose of Vistaril.  Dr. Luu's objective observations of Plaintiff were: disheveled appearance (commenting "appropriate, unkempt, ungroomed, looking tired, dark halo around eyes"); depressed mood; cooperative behavior; normal motor activity, cognition, speech, orientation, thought content, insight and judgment, affective range (same comment as previous visit, "brighter"); alert sensorium; organized thought processes; and average intelligence.  In her assessment, Dr. Luu wrote that Plaintiff's response to medication was "worse."  The primary diagnosis remained "Axis I: 296.33 – Major Depressive Disorder, Recurrent, Severe Without Psychotic Features."  Dr. Luu opined that Plaintiff had a GAF score of 55.[19]  Dr. Luu refilled one prescription and increased the dosage for her anxiety medication.

7.   Treating Counselor: Patricia Lometti, LCSW[20]

For at least January 2012, Plaintiff was under the care of the Licensed Clinical Social Worker ("LCSW"), Patricia Lometti, a senior licensed mental health clinician at the Fresno County Mental Health Plan, Department of Behavioral Health.  About each session, the LCSW produced type-written treatment notes.  About the January 4, 2012 session with Plaintiff the LCSW acknowledged that Plaintiff had completed the Pathways Program, and listed Plaintiff's "current clinical symptoms/behaviors," as:

---

[18] A GAF score of 51-60 is indicative of moderate symptoms such as a flat affect or occasional panic attacks, or moderate difficulty in social, occupational or school functioning such as having few friends or having conflicts with coworkers. DSM-IV at 31-34.

[19] *Id.*

[20] AR 430-51.

1. Severe depression pervasive daily since age 23 when her father died
2. Anger, irritability, sadness daily since age 23
3. Disturbed sleep with nightmares sleeping, 3 to 4 hours per night since her baby died in June of 2010

As a "medical necessity," the LCSW opined that Plaintiff had a "significant impairment," with "probability of significant deterioration."  The LCSW noted that Plaintiff "[w]ent to Pathways and completed the program in 6 to 8 months. Individual therapy with Nicki Graham and Jamie Powers, LMFT at Pathways."  The LCSW proposed that a "significant reduction in symptoms," should control Plaintiff's ultimate discharge date and proposed a 12-month duration, and set objectives:

1. Decrease depression to 4 days per week through medication services, CBT, ego supportive services
2. Reduce feelings of anger, irritability, and sadness to 4 days per week through medication services, grief counseling, and CBT
3. Improve sleep to 7 hours per night through medication services, resolution of crisis pregnancy, and CBT

The LCSW emphasized that Plaintiff had "a history of extensive loss through[ou]t her life."

## LEGAL STANDARD

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

25

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments, 20 C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC, despite the impairment or various limitations to perform his past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id*. §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404 .1520, 416.920.

## DISCUSSION

Plaintiff argues that the ALJ erred in her assessment of the relative weight of the treating physician Dr. Guzzetta and implicit rejection of evidence from Plaintiff's treating therapist, Jaime Powers, a licensed marriage and family therapist, as well as from Plaintiff's treating counselor, Patricia Lometti, a licensed clinical social worker.  Plaintiff contends that this legal error resulted in the ALJ's erroneous step-two determination that Plaintiff does not have an impairment that meets or equals any impairments listed in 20 C.F.R. Pt. 404, Supt. P, App. 1.  Plaintiff contends that the ALJ compounded the error by relying on improperly weighted medical evidence for an erroneous assessment of Plaintiff's RFC.  The Commissioner replies that the ALJ did not err in weighing the

26

medical evidence because the ALJ properly discounted Dr. Guzzetta's internally inconsistent opinion which was based on Plaintiff's self-serving complaints, in favor of the State agency consulting physician's opinion which was consistent with the objective evidence of record and Plaintiff's conservative treatment.  Further, the ALJ reasonably assessed Plaintiff's RFC based on the reliable evidence.

## I.    SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  If the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence, this Court must uphold the ALJ's determination that the claimant is not disabled.  *See, e.g., Ukolov v. Barnhart*, 420 F.3d 1002, 104 (9th Cir. 2005); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burch*, 400 F.3d at 679.  Where the evidence as a whole can support either outcome, the Court may not substitute its judgment for the ALJ's, rather, the ALJ's conclusion must be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## II.    SEQUENTIAL ANALYSIS

Based on the weight of the medical opinions, the ALJ concluded that the Plaintiff's subjective complaints were greater than the objective findings and not consistent with the objective medical evidence.  Plaintiff was 27 years old on the alleged disability onset date, a younger

individual according to the Medical-Vocational Guidelines.  *See* 20 C.F.R. 404.1563(c)-(e).  Plaintiff completed high school and was able to communicate in English.

The first step of the ALJ's sequential analysis is not at issue.  Both Plaintiff and the Commissioner agree that Plaintiff was not currently performing substantial gainful work and had not engaged in substantial gainful activity since September 15, 2009, her alleged onset date.  *See* 20 C.F.R. § 416.920(a)(4)(i).

At Step Two, the ALJ determined that Plaintiff's medically determinable impairments were major depressive and anxiety disorder.  *See* C.F.R. 404.1520(c), and 416.920(c).  However, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that had significantly limited (or would be expected to significantly limit) the ability to perform basic work-related activities for 12-consecutive months; therefore, Plaintiff did not have a severe impairment or combination of impairments.  *See* 20 CFR §§ 404.1521 *et seq*., 416.921 *et seq*.  On that basis, the ALJ decided that Plaintiff had not been under a disability, as defined in the Social Security Act, from September 2009, through the date of her decision.  *See* CFR §§ 404.1520(c), 416.920 (c).

The ALJ proceeded to assessing the claimant's RFC, the intermediate step between steps three and four**.**  *See* 20 C.F.R. § 416.920(e).  In doing so, the ALJ stated that she considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ concluded that Plaintiff had the RFC to perform a full range of work at all exertional levels but with nonexertional limitations: "the claimant can perform simple, routine, and repetitive tasks with only occasional interaction with the public."  The ALJ did not include any physical or environmental limitations.

At Step Four, the ALJ must determine whether, in light of the claimant's RFC, she can return to substantial gainful activity performed in the past.  20 C.F.R. § 404.1520(e).  Considering Plaintiff's age, education, work experience and RFC, the ALJ found that Plaintiff was not capable of performing any past relevant work and did not have any readily transferrable skills.

At Step Five, the Commissioner must establish that the claimant is capable of performing substantial gainful work.   At the hearing the ALJ presented a hypothetical RFC to the VE, who testified that an individual burdened with the stated limitations could obtain other gainful work in the economy and that such jobs were available in significant numbers in the national economy.  *See* 20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a).  On that basis, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

Plaintiff challenges the ALJ's nondisability determination because the ALJ's Step-Two findings and conclusion are not supported by substantial evidence because she improperly weighed mental health providers' opinions.

### A.  Step-Two Findings and Conclusion

The ALJ found that Plaintiff had no severe mental impairments at Step Two, and determined that Plaintiff's RFC would not be significantly impacted by her mental condition.  Plaintiff first contends that the ALJ improperly weighed the medical evidence at this step.

At Step Two, the burden is on a plaintiff to make a threshold showing that her medically determinable impairments significantly limit his ability to perform basic work activities.[21]  *See Bowen v. Yuckert,* 482 U.S. 137, 145, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).  To that end, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'"  *Smolen,* 80 F.3d at 1290 (quoting Social Security Ruling (SSR) 85–28).  "[T]he step two inquiry is a *de minimis* screening device to dispose of groundless claims."  *Id.* (citing *Bowen v. Yuckert,* 482 U.S. 137, 153–54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).  A claimant's own statement of symptoms alone is not enough to establish a medically determinable impairment.  *See* 20 C.F.R. §§ 404.1508, 416.908.  To establish the existence of a

---

[21] "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b).

medically determinable impairment, a plaintiff must provide medical evidence consisting of "signs—the results of 'medically acceptable clinical diagnostic techniques,' such as tests—as well as symptoms," a claimant's own perception or description of his physical or mental impairment. *Ukolov v. Barnhart,* 420 F.3d 1002, 1005 (9th Cir. 2005).

At least three physicians, one psychotherapist, one LMFT, and one LCSW each ran a series of tests or evaluated Plaintiff's mental state, and all diagnosed Plaintiff with varying degrees of depression or other mental impairments such as anxiety or depression with or without psychotic features. AR 247-49, 297-303 (Richard Guzzetta, M.D.), AR 321-23 (Robert Holloway, M.D.), AR 312-320 (Luyen Luu, M.D.), AR 250-56, 259-62 (Jamie Powers, LMFT), AR 305 (Richard Morgott, Ph.D., LMFT), AR 310 (Patricia Lometti, M.S.W., LCSW). No contradictory evidence exists on the record from any health professional indicating that Plaintiff did not have a mental disorder of some type. While some medical or layman opinions can be accorded less weight, there is no medical evidence that supports the ALJ finding that the mental impairment claims does not surpass the *de minimis* screening threshold device to simply dispose of groundless claims. In light of the complete absence of medical evidence contradicting the existence of mental impairments, to find at Step Two that Plaintiff suffers from no severe mental impairments violates the standard of review of medical opinions set out in *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007). Moreover, the ALJ made her step-two findings on the basis that the claimant had no more than "mild" limitations in any of the first three functional areas. By the ALJ's own determination, this is incorrect. In the preceding analysis of the second functional area, the ALJ concluded that "the claimant has moderate limitation." The Court concludes that the ALJ's step-two decision was made in legal error.

### B. Plaintiff's Credibility

By her argument that the ALJ improperly discounted her treating physician's opinions, Plaintiff implicitly alleges that the ALJ improperly discounted Plaintiff's subjective testimony upon which the treating mental health professionals relied.

30

In *Cotton v. Bowen* the Ninth Circuit established two requirements for a claimant to present credible symptom testimony: the claimant must produce objective medical evidence of an impairment or impairments, and she must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Cotton,* 799 F.2d 1403, 1407 (9th Cir. 1986). The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity. *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996).

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, the ALJ can reject the claimant's pain testimony only if he provides clear and convincing reasons for doing so. *Parra,* 481 F.3d at 750 (citing *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.1995)).  General assertions that the claimant's testimony is not credible are insufficient. *Id.* The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (quoting *Lester,* 81 F.3d at 834).  The consistency of claimant's daily activities with the medical record is relevant when determining the claimant's credibility and may constitute a clear and convincing reason to reject a claimant's testimony. *Smolen,* 80 F.3d at 1284.

The ALJ concluded Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but she concluded Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible.  An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*, 495 F.3d at 635; *see also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be

1
2

"sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

3

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for

4

truthfulness, inconsistencies in claimant's testimony or between his testimony and conduct,

5

claimant's daily activities, claimant's work record, and testimony from physicians and third parties

6

about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security*

7

*Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques

8

of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements

9

concerning the symptoms, and other testimony by the claimant that appears less than candid;

10

(2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

11

of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039

12

(9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is

13

supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278

14

F.3d at 959.

15

16

17

Here, the ALJ wrote the following:

18

> The claimant's allegations are not fully credible. The claimant has received limited treatment.
> The Claimant showed significant improvement with treatment and medication. There was no
> period of 12 months or longer with greater than the above-cited limitations. The claimant has
> an inconsistent work history.

19

20

21

The ALJ failed to actually highlight inconsistencies in Plaintiff's testimony. The ALJ also

22

mischaracterizes Plaintiff's treatment. By no measure is six to eight months of daily mental health

23

treatment "limited treatment," and certainly could not be considered so when taken together with the

24

mental health treatment provided by no fewer than three physicians (Drs. Guzzetta, Holloway, and

25

Luu), one psychotherapist (Morgott), one LMFT (Powers), and one LCSW (Lometti).

26

Also contrary to the ALJ's assessment, Dr. Georgis specifically noted that Plaintiff was a

27

"reliable historian." The LMFT at Pathways emphasized that Plaintiff regularly attended daily

28

32

treatment, persuasive evidence of Plaintiff's veracity.  Significantly, the ALJ does not cite clinical evidence to support the proposition that Plaintiff "showed significant improvement," because she cannot.  After careful review, the Court finds no such statement in the record. The ALJ also states that Plaintiff had an inconsistent work history, cutting against her credibility.  However, past work history does not alone establish a sufficient basis for discrediting Plaintiff's testimony as to the severity of her impairments.  Even assuming it did, Dr. Fair specifically commented on Plaintiff's "strong work history," and the ALJ gave Dr. Fair's opinion "substantial weight."

At bottom, the ALJ makes only general assertions as to Plaintiff's lack of credibility, and fails to specify what undermines her credibility.  Rather than discrediting Plaintiff, medical records substantiate Plaintiff's testimony.  The ALJ's determination is contrary to the treating physicians' medical opinion and lacks specific supporting evidence.  On this record, the Court concludes that the ALJ erred when she did not provide clear and convincing reasons supported by substantial evidence for rejecting Plaintiff's subjective symptom testimony as to the degree of her functional limitations.

### C.  RFC Construction

The ALJ constructed this RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine, and repetitive tasks with only occasional interaction with the public.

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment. *Clayton v. Astrue,* 2011 WL 997144, at * 3 (E.D. Cal. Mar. 17, 2011) (citing 20 C.F.R. §§ 404.1520(a), 416.920(a)).  These regulations provide a method for evaluating a claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520(a).  In conducting this inquiry, the

ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how the claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. § 404.1520a(b).  The ALJ must tie the objective factors of the record as a whole to the opinions and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary. *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997). The ALJ must then assess the degree of the claimant's functional limitations based on the individual's impairments. 20 C.F.R. § 404.1520a(c).

1.  Improperly Rejected Evidence from the LMFT and LCSW

By Plaintiff's argument, she implicitly contends that because the ALJ failed to discuss the Licensed Marriage and Family Therapist[22] and Licensed Clinical Social Worker's[23] opinions, she improperly rejected them.  Defendant asserts that the ALJ provided germane reasons to favor other medical opinions and did so with substantial evidentiary support.

An ALJ may reject the opinion from "other sources" not considered "an acceptable medical source" by providing germane reasons for doing so. *Turner v. Comm'r of the Soc. Sec. Admin.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Acceptable medical sources are found in 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5), and other sources who are not acceptable medical sources are

---

[22] Licensing as an LMFT in California requires either a qualifying Doctor's or Master's degree from an accredited program, having completed 104 weeks of supervision and documented 3,000 hours of supervised work experience where at least 500 hours must be psychotherapy with families, couples, or children, as well as passing the state's standard written examination and written clinical vignette examination. *See* California Board of Behavioral Sciences, available at http://www.bbs.ca.gov/app-reg/mft_requirement.shtml (accessed Nov. 26, 2014).

[23] Licensing as an LCSW in California requires an MSW from an accredited social work program, as well as having completed 3,200 hours of supervised work experience, where at least 750 hours must be in psychotherapy and at least 2,000 hours must be in combined diagnosis, assessment, treatment, counseling, and psychotherapy. *See* National Association of Social Workers, California Chapter, available at http://www.naswca.org/?151 (accessed Sept. 29, 2014); *see also* Association of Social Work Boards, clinical requirements, available at http://www.aswb.org/licensees/about-licensing-and-regulation/ (accessed Sept. 29, 2014).

found in 20 C.F.R §§ 404.1513(d)(1)-(4), 416.913(d)(1)-(4).  The record contains extensive

treatment notes about Plaintiff written by Ms. Powers, LMFT, and Ms. Lometti, MSW, LCSW.

Despite the LMFT's long relationship and extensive treatment notes in the record, as well as

the LCSW's corroborating notes, the ALJ ignored the professional opinions of the two mental health

care providers.  The ALJ did not mention the LCSW or LMFT in her opinion, other than to say:

> The medical record shows the claimant has received limited treatment since October 2010 for
> depression, anxiety, and bereavement.  In November 2010 (Exhibit 1F), the claimant enrolled
> in pathways to recovery, mental health track.  She attended this program 15 hours per week.

Absent any justification for ignoring this evidence, the ALJ implicitly rejected it.  Ms.

Powers' and Ms. Lometti's opinions are not due the same deference as a treating physician[24] because

they are an LMFT and LCSW, respectively.  Certainly the ALJ may make credibility determinations,

but the ALJ must at least consider relevant evidence from an "other source." 20 C.F.R. §

404.1513(a)(1)-(5).  Whatever the Commissioner's proffered justification now, it is improper

because "[a]ccording to the Ninth Circuit, long standing principles of administrative law require us

to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ – not

*post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v.*

*Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009) (citing *SEC v. Chenery Corp.*,

332 U.S. 194, 196) (1947)).  By omitting the LMFT's or LCSW's opinions in the analysis, the ALJ

rejected it and failed to give any germane reason for doing so.  That omission constitutes legal error.

Finally, because the ALJ did not proffer legally sufficient reasons for rejecting or discounting

the "other source" opinions outlined above, the Court credits those opinions as true.  *See Lester v.*

*Chater,* 81 F.3d 821, 834 (9th Cir.1995) (the Ninth Circuit has favored the "credit as true" doctrine

since *Varney* was decided); *Smolen,* 80 F.3d at 1292; *Reddick,* 157 F .3d at 729; *Harman v. Apfel,*

211 F.3d 1172, 1178 (9th Cir. 2000); *Moore v. Comm'r of Soc. Sec.,* 278 F.3d 920, 926 (9th Cir.

---

[24] A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v.*
*Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

2002); *McCartey v. Massanari,* 298 F.3d 1072, 1076–77 (9th Cir. 2002); *Moisa v. Barnhart,* 367 F.3d 882, 887 (9th Cir. 2004); *Benecke v. Barnhart,* 379 F.3d 587, 593–95 (9th Cir. 2004); *Orn,* 495 F.3d at 640; *Lingenfelter,* 504 F.3d at 1041.

### 2.  Weighing Medical Source Evidence

Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "An ALJ is not bound by an expert medical opinion on the ultimate question of disability."  *Tomasetti*, 533 F.3d at 1041; SSR 96-5p.  Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] not treat[ed] the claimant (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant.[25] *Id.* The corollary is that an examining physician's opinion is generally entitled to more weight than that of a nontreating physician.  *Lester*, 81 F.3d at 830

An ALJ must determine a claimant's RFC based on "all relevant evidence in the record." *Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.  Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she

---

[25] The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

Where an examining physician's opinion is uncontradicted by another doctor, the ALJ must provide "clear and convincing" reasons for rejecting that physician's ultimate conclusions. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). The ALJ must tie the objective factors of the record as a whole to the opinions and findings that she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary. *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997).

Here, the ALJ was required to set forth specific clear and convincing reasons for rejecting the opinion of the uncontradicted treating physicians. The ALJ recognized that there was consensus between the treating physicians that Plaintiff had mental health impairments that affected whether she was able to perform work, with only some differences in the degree of specific function-by-function limitations.

a. Psychotherapist Richard Morgott, Ph.D., LMFT

In her decision, the ALJ acknowledged that Dr. Morgott opined the following:

> There is an April 2011 statement from Richard Morgott, Ph.D. (Exhibit 11F) indicating that the claimant is unable to work.

The ALJ determined that Dr. Morgott's opinions deserved reduced weight:

> This statement is not in the form of a residual functional capacity, but in any case is inconsistent with the medical record (Exhibit 2F, pp. 2-3) and has been given little weight.

The ALJ offered no other support for her findings. In his April 29, 2011 report, Dr. Morgott did more than indicate Plainitff is unable to work. Dr. Morgott opined that Plaintiff's condition was "chronic," he expected her condition to last at least one year (until April 29, 2012), that she was not able to work, and that she had limitations that affected her ability to work or participate in education or training, but did not require someone to be in the home to care for her. The ALJ omitted these

details.  The only potential support for the ALJ's findings is her cite to pages two and three of

Exhibit 2F, Dr. Guzzetta's progress notes dated December 14 and 21, 2010.  Nevertheless, because

the ALJ relied on the general statement that Dr. Morgott's opinions are inconsistent with the medical

record but did not give specific contradictory evidence, the Court cannot speculate as to which

possible inconsistencies, if any, were meant to bolster the ALJ's finding.  The ALJ's findings lack

clear and convincing reasoning.

This error in the factual basis of the ALJ's analysis is prejudicial to the Plaintiff and not

supported by substantial evidence.  The entirety of the ALJ's justification for discounting Dr.

Morgott's opinions as to Plaintiff's functional limitations relies on unsupported speculation.

Unsupported speculation is not a reasonable justification for discounting a medical opinion from an

examining or treating physician.  On this basis, the Court concludes that the ALJ's analysis failed to

tie the objective factors of the record as a whole to the opinions and findings that she rejects,

therefore she erred by rejecting the psychotherapist's assessment of Plaintiff's limitations in favor of

her own interpretation.

### b. Treating Physician Richard Guzzetta, M.D.

About Dr. Guzzetta's medical opinion, the ALJ wrote the following:

In March 2011, treating psychiatrist Richard Guzzetta, M.D. (Exhibit 9F) stated that the claimant was unable to perform simple and repetitive tasks and was fully able to interact with supervisors, co-workers, and the public when stable on medication.  He opined she was able to hand[le] funds.  She was able to focus for 30 minutes at a time.  However, he opined she was unable to handle stress.  She had no side effects from medication.  This statement is inconsistent with the medical record and normal mental status examinations (Exhibit 2F, pp. 2-3).  Dr. Guzzetta noted the claimant had normal cognition, normal thought content, normal mood, and organized thought processes (Exhibit 2F, pp. 2-3).  In March 2011, Dr. Guzzetta noted a normal mental status examination with normal thought content, normal mood, and organized thought processes (Exhibit 10F, pp. 2-3).

The ALJ gave reduced weight to Dr. Guzzetta's opinions because she found it internally

inconsistent.  The ALJ emphasized that Dr. Guzzetta's medical opinions about Plaintiff's inability to

focus or handle stress were inconsistent with the doctor's other findings that she had normal

cognition, thought content, mood, and thought processes.  Surely it is within the ALJ's dominion to weigh credibility and make the ultimate disability determination.  However, medical conclusions are the province of the medical professionals, conclusions which the ALJ cannot reject in favor of her own medical conclusions.  Nearly every medical progress note in the record serves as illustration that Plaintiff had some symptoms (e.g. severe depression, fatigue, inability to concentrate, memory problems), but did not have others (e.g. normal cognition, thought processes).  But, against that backdrop, the ALJ erroneously draws two medical conclusions.

First, she set this assumption: when an individual exhibits some normal mental function, she does not warrant a certain diagnosis and resulting limitations.  But just as it is unreasonable to infer that a person does not have cancer because she has no signs of pneumonia, no reasonable jurist could reach the conclusion that a doctor is precluded from making a diagnosis or assessing a set of limitations based on his assessment of an individual's *actual* symptoms, merely because other symptoms are *not* present.  The ALJ did not cite to, and this Court cannot find, anything in the record or case law to support the proposition that if a claimant has some symptoms and not others then medical conclusions are necessarily limited to certain findings.

Second, the ALJ used that false assumption to draw her own medical conclusion that Plaintiff had only nonsevere mental conditions and resulting limitations.  Dr. Guzzetta's medical opinion specifically acknowledged that Plaintiff did not have certain symptoms, yet – on the basis of other actual symptoms – the doctor concluded that Plaintiff had major depressive disorder, anxiety, and *resulting mental impairments that affected her ability to work*.  Drs. Holloway and Luu, the LMFT, and Dr. Morgott all reached similar conclusions despite also finding that Plaintiff had some normal function.  For example, Dr. Holloway noted in July 2011 that Plaintiff had normal thought content, yet still determined that her mood was "[d]epressed, anxious."  Despite finding Plaintiff had normal insight and judgment, Dr. Holloway found her affective range was "other."  And, although Dr. Holloway noted that Plaintiff had shown some improvement, he still diagnosed her with "Major

39

Depressive Disorder, Recurrent, Severe with Psychotic Features," and gave her a GAF score of 43. Taken together with opinions from the LMFT and LCSW at Fresno County Behavioral Health, these opinions tend to support the clinical finding that Plaintiff had limitations that affected her ability to work. Consequently, the balance shifts to support that Plaintiff had moderate to severe mental limitations. The ALJ erroneously substituted her own medical conclusions for that of the doctors' conclusions that Plaintiff had a severe mental condition and concomitant focus and stress-related limitations.

The Court finds that the given justifications do not rise to the requisite level of specificity and clarity to reject uncontradicted medical opinions. Nor do they rise to the level of specific and legitimate reasons required for the ALJ to reject conflicting opinions between examining physicians. These omissions constitute legal error at intermediate Step Three, the RFC determination.

3. Medical Opinions of Plaintiff's Limitations Relevant to RFC Construction

The ALJ's *pro forma* statement that her RFC assessment is "supported by the medical record, State agency opinion, and overall evidence of record," mischaracterizes the evidence. The ALJ implicitly and explicitly rejected evidence that tended to support Plaintiff's limitations. The significance of that information renders a comparative analysis of the evidence from the treating professionals and the consulting State agency physician relevant to the RFC construction. Ignoring relevant evidence including a longitudinal assessment of Plaintiff's mental condition by mental health professionals such as the LMFT and Dr. Guzzetta, the ALJ instead gave "substantial weight" to the non-treating consulting State agency physician, Dr. Fair. About Dr. Fair the ALJ wrote:

> The State agency determined the claimant could perform simple and routine work on a consistent basis and could interact with others on a limited basis (Exhibit 6F, p. 3). This opinion has been given substantial weight because it is consistent with the medical record and overall evidence of record. The State agency opined the claimant could perform a full range of medium work (Exhibit 7F). This opinion has been given some weight, but evidence at the hearing showed the claimant had non-severe physical impairment.

Notwithstanding the ALJ's statement to the contrary, the evidence of record contradicts Dr. Fair's opinions.  For example, contrary to Dr. Fair's assessment, treating physician Dr. Guzzetta opined that Plaintiff could not perform simple and routine work and that she could not concentrate for more than 30 minutes.  Dr. Guzzetta's March 2011 statements concerning Plaintiff's ability to potentially successfully interact with others were contingent statements that relied upon her being stable on her medications.  The ALJ conflates being stabilized on medications with being medication compliant.  However, records illustrate that even when Plaintiff was medication adherent, her doctors adjusted or changed her prescription levels at nearly every visit.  Dr. Luu was still adjusting Plaintiff's anxiety medication as late as March 2012.  Moreover, no physician opined that Plaintiff was stabilized on her medication.  As a result, Dr. Guzzetta's contingencies cannot weigh on the RFC construction other than to highlight that doctors continued to consider Plaintiff functionally impaired during the relevant period.   In another contradiction, Dr. Fair checked a box on the PRTF checklist to indicate that Plaintiff's severe impairments were not expected to last 12 months.  To the contrary, Plaintiff's treating physician Dr. Guzzetta determined that Plaintiff's symptoms could be reevaluated "in one year."  Dr. Holloway estimated the same.  The LMFT and LCSW both opined in 2011 and 2012 that Plaintiff had a poor prognosis and that they expected Plaintiff's condition to deteriorate.  The overwhelming weight of evidence does not support Dr. Fair's opinions.

Unlike the written assessments and progress notes from the physicians and mental health professionals, the reports from Dr. Fair are checklist forms with sparse comments.  When included, the comments are conclusory statements such as "she will be able to understand and remember detailed tasks," and "she will be able to persevere and concentrate on simple, routine work over an extended period of time," without any supporting statements to substantiate the conclusions.  Moreover, Dr. Fair's reports have inaccuracies upon which the ALJ should not have relied.  For example, the PRTF prompted Dr. Fair to answer whether records indicated that Plaintiff showed characteristics of a depressive syndrome (characteristics: anhedonia or pervasive loss of interest in

almost all activities; appetite disturbance with change in weight; or sleep disturbance; or decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; hallucinations, delusions or paranoid thinking).  Dr. Fair indicated that Plaintiff had not exhibited these characteristics.  Not so.  As early as November 2010, Dr. Guzzetta documented Plaintiff's feelings of extreme sedation, focus and concentration problems, sleep disturbance, appetite disturbance and weight gain.  Similar findings from other providers also precede Dr. Fair's report.  Medical progress notes from Drs. Guzzetta, Holloway, and Luu, all at some point document Plaintiff exhibiting many of the 12.04 characteristics.  By the hearing in May 2012, the ALJ had corroborating evidence from the LMFT's November 2011 assessment which specifically noted that Plaintiff was experiencing anhedonia, loss of interest in activities, fatigue, appetite and sleep disturbance, weight gain, energy loss, difficulty concentrating, memory problems, and paranoia.  Dr. Fair's opinions are contrary to the totality of evidence from treating and other sources.

In addition to the newly credited opinions from "other sources," this Court has made an exhaustive review of the record, and here summarizes the physicians' opinions of Plaintiff's functional limitations to be credited.  In the period November-March 2011, Plaintiff's treating physician at Fresno County Mental Health Plan at the Department of Behavioral Health, Dr. Guzzetta, diagnosed "depression" and gave the following limitations in March 2011: if not stabilized on medication, Plaintiff may not be able to relate and interact with supervisors; "trouble with concentration and therefore would have trouble" understanding, remembering, and carrying out an extensive variety of technical and/or complex job instructions; unable to understand, remember and carry out simple one-or-two step job instructions unless stable on medication; unable to maintain concentration and attention for two hour increments, but is "able to focus for up to 30 minutes at a time"; unable to withstand the stress and pressures associated with an eight-hour work day and day-to-day work activity; expected duration and prognosis of Plaintiff's impairments were that "symptoms may improve over time" and he recommended to "re-evaluate in one year."

In July 2011, Dr. Holloway's primary diagnosis was "Major Depressive Disorder, Recurrent, Severe with Psychotic Features."  Dr. Holloway noted that Plaintiff's GAF score peaked at 41 in the prior year, and in that context, he considered Plaintiff "improved" for rising to a GAF score of 43.  A GAF score within the range of 41-50 indicates "serious symptoms," and could signal "any serious impairment in social, occupational, or school functioning."  *DSM-IV* at 31-34.  DSM-IV examples include having few friends and inability to keep a job. *Id.*

Dr. Luu diagnosed Plaintiff with "major depressive disorder, recurrent, severe without psychotic features."  Plaintiff was relatively improved by August 2011, when Dr. Luu assessed her GAF score at 61.  Yet Dr. Luu maintained a primary diagnosis of "major depressive disorder," continued to consider the condition "recurrent" and "severe."  The doctor noted that Plaintiff exhibited sleep disturbance and anxiety.  Dr. Luu considered Plaintiff "worse" by December 30, 2011, noting sleep irregularities, diminished appetite, disheveled appearance, and extensive history of loss, about which the doctor concluded Plaintiff "need[ed] . . . to have therapy."  Dr. Luu gave her a GAF score of 49.  Less than a month later Dr. Luu noted that Plaintiff was "brighter" with improved sleep patterns, but still only gave Plaintiff a GAF score of 55 and maintained that her "Major Depressive Disorder," was "Recurrent" and "Severe."  This bears out two months later in March 2012, when Dr. Luu reported that Plaintiff was again "worse," and her high anxiety continued despite a relevant prescription.  Dr. Luu observed that Plaintiff appeared disheveled, unkempt, ungroomed, looked tired, and had depressed mood.  Dr. Luu increased her anxiety medication.  Over this period, Dr. Luu's given GAF scores were: August 19, 2011 (GAF 61)[26]; December 30, 2011 (GAF 49)[27]; January 27, 2012 (GAF 55)[28]; and, March 23, 2012 (GAF 55).  Consistent with other

---

[26] A GAF of 61–70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV* at 31-34.

[27] A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *DSM–IV* at 31-34.

clinical opinions of a poor prognosis, expected deterioration, and a recurrent condition, Dr. Luu's medical progress notes illustrate that Plaintiff's condition was ongoing.

The weight of the evidence directly contradicts the consulting physician's opinion, upon which the ALJ relies to support her determination.  The Court concludes that the ALJ's RFC determination is premised on legal error and is not supported by substantial evidence.

### D.  Harmless Error

An error may be considered harmless where it "occurred during an unnecessary exercise or procedure;" is nonprejudicial to the plaintiff; is considered irrelevant to the determination of nondisability; or if the reviewing court can "confidently conclude" that no reasonable ALJ could have reached a different disability determination if erroneously disregarded testimony was credited. *See Stout v. Comm'r. Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).

The ALJ justifies favorably weighing Dr. Fair's opinion because it is "consistent with the medical record and overall evidence of record."  This is starkly incorrect in light of the treating physicians' and other treating mental health professionals' credited opinions.  The ALJ's analysis fails to rise to the requisite level of clear and convincing evidence necessary in an RFC determination to up-end the treating physicians' opinions in favor of a contradictory consulting opinion.  In the face of substantial, consistent, and corroborative evidence in the record from Drs. Guzzetta, Holloway, Luu, Morgott, and the newly credited evidence from the "other sources," the Court cannot say that a reasonable ALJ would not have reached a different conclusion at Step Two and the RFC determination if the erroneously disregarded testimony was credited.

Accordingly, improperly weighing the opinion evidence was not harmless error.  *See Stout*, 454 F.3d at 1056.

//

---

[28] A GAF score of 51-60 is indicative of moderate symptoms such as a flat affect or occasional panic attacks, or moderate difficulty in social, occupational or school functioning such as having few friends or having conflicts with coworkers. *DSM-IV* at 31-34.

**E.  Remand**

This Court has discretion to reverse and remand this case for further administrative proceedings or for an immediate award of benefits. *See* 42 U.S.C. 405(g) (sentence four); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).  However, "remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits." *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001).

In *Smolen v. Chater,* the Ninth Circuit held that evidence should be credited and an action remanded for an immediate award of benefits when the following three factors are satisfied: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. 80 F.3d 1273, 1292 (9th Cir.1996); *see Varney v. Sec. of Health & Human Servs.*, 859 F.2d 1396, 1400 (9th Cir. 1988) ("In cases where there are no outstanding issues that must be resolved before a proper determination can be made, and where it is clear from the record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony."); *Swenson v. Sullivan,* 876 F.2d 683, 689 (9th Cir.1989) (same); *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir.1989) ("In a recent case where the ALJ failed to provide clear and convincing reasons for discounting the opinion of claimant's treating physician, we accepted the physician's uncontradicted testimony as true and awarded benefits.") (citing *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir.1988)); *Hammock v. Bowen,* 879 F.2d 498, 503 (9th Cir.1989) (extending *Varney II's* "credit as true" rule to a case with outstanding issues where the claimant already had experienced a long delay and a treating doctor supported the claimant's testimony).

Is to the first element, the Court concluded, *supra*, that the ALJ failed to give legally sufficient reasons for rejecting evidence therefore the ALJ improperly weighed the opinions of

medical sources and laymen in her RFC determination.  A severe impairment of depression or other mental impairment at Step Two does not necessarily translate into a finding of disability. *Parra*, 481 F.3d at 746 (citing *Bustamante*, 262 F.3d at 954)).  However, the VE's hearing testimony in response to the ALJ's second hypothetical was that a similarly capable individual could not perform any work.  Therefore, it is clear from the record that the ALJ would be required to award benefits based on the VE's testimony and the credited evidence.  As no outstanding issues exist to resolve before a determination of disability can be made, the Court remands for calculation of benefits.

## III.      CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that the ALJ's nondisability determination includes legal error and is not supported by substantial evidence.  While the Court well understands that Administrative Law Judges reviewing disability claims have an overwhelming case load, the inattention to detail in this case is unacceptable.  The Court will grant Plaintiff's appeal and remand for calculation of benefits because no further hearing is required to develop the record.  Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security (Doc. 1) is **GRANTED**.

**IT IS FURTHER ORDERED** that pursuant to sentence four of 42 U.S.C. § 405(g), that the matter is **REMANDED** for calculation of benefits; and,

**IT IS FINALLY ORDERED** that the Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff, Angelic Renee Pallesi, and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and shall **TERMINATE** this action.

IT IS SO ORDERED.

Dated:   __December 11, 2014__                    _____/s/ Sandra M. Snyder_____
                                                                  UNITED STATES MAGISTRATE JUDGE