# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELIC RENEE PALLESI,<br><br>             Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>             Defendant. | Case No. 1:13-cv-01813-SMS<br><br><br>ORDER AFFIRMING AGENCY'S DENIAL<br>OF BENEFITS AND ORDERING<br>JUDGMENT FOR COMMISSIONER |

Plaintiff Angelic Renee Pallesi, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II and for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge.

The sole issue in this case is whether the Administrative Law Judge (ALJ) erred in failing to give reasons for her rejection of the opinions of Plaintiff's treating physician.  Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

I.      **Procedural History**

On November 23, 2010, Plaintiff filed applications for disability insurance benefits and for supplemental security income.  Plaintiff alleged disability beginning December 18, 2007.  The Commissioner initially denied the claims on February 25, 2011, and upon reconsideration, on June 16, 2011.  On July 6, 2011, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on May 22, 2012.  Alan E. Cummings, an impartial vocational expert, also appeared and testified.

On May 25, 2012, Administrative Law Judge Tamia N. Gordon denied Plaintiff's application.  The Appeals Council denied review on September 12, 2013.  On November 7, 2013, Plaintiff filed a complaint seeking this Court's review.

II.     **Factual Summary of Administrative Record**

**Plaintiff's testimony**.  Plaintiff (born October 28, 1981) completed high school and vocational college training to be a medical assistant.  Her prior work included managing a McDonald's restaurant and installing rain gutters.  Unemployed since September 2009, Plaintiff supported herself and her eight-year-old son[1] on welfare, food stamps, and Medi-Cal.

Plaintiff saw Dr. Luu at the Fresno County Department of Behavioral Health for medications every three months.   She also met with a therapist twice a month.  Plaintiff complained that her anxiety was worsening, even though her doctor had doubled Plaintiff's medication.  Her depression was also worsening; she was "stuck grieving."  AR 47.  Three or four times daily, she experienced bouts of crying that lasted five to ten minutes.  As a result of her anxiety and the side effects of her medications, the back of Plaintiff's head has been "completely bald" for the past two years.  AR 41. Plaintiff has not used illegal drugs since 2009.

Plaintiff typically began her day by walking her son to school, then returning directly home since she was "frightened to go outside."  AR 42.  On days when she felt too frightened to escort her

---

[1] Plaintiff also had another child who lived with his father.  *See* AR 317.

son to school, he walked with his cousin who lived in the same apartment complex.  She spent her days doing housework and watching television.  Because her feet swell, Plaintiff could not do housework for more than an hour at a time.  She cooked only supper since her son received breakfast and lunch at school.  Plaintiff last drove about a year before the hearing, subsequently relying on family members to drive her.  She shopped once monthly when her grandmother took her to the supermarket.

Plaintiff estimated that she could lift thirty or forty pounds, about the weight of her television set.  Plaintiff could walk about twenty minutes before she needed to rest.  Because of her back pain she could sit for only thirty minutes.  Unable to concentrate, she never finished tasks.

Plaintiff completed an adult function report dated January 5, 2011.  On a typical day, she woke up, took medications, exercised, and attended the Pathways program.  She spent evenings with her son.  She fed and cared for her cat.  Her grandmother provided support with life management skills and caring for her son as well as giving her financial support since she could not make ends meet on welfare.

"I just gave up when my baby died," wrote Plaintiff.  AR 211.  She had difficulty sleeping.  Stress made her hair fall out.  She bathed twice daily but wore the same clothes day after day.  The outside world scared her.

Plaintiff's grandmother, Barbara Slavin, provided a third-party adult function report dated January 5, 2011.  Ms. Slavin opined that even before she applied for disability benefits, Plaintiff had "trouble coping with life."  AR 203.  She had difficulty getting along with others and could not take direction.  She was depressed and preoccupied with her baby's death.  She had problems with memory and concentration, and thought others were "out to get her."  AR 207.

Plaintiff, who was insecure going out alone, generally stayed home, reported Ms. Slavin, although she attended counseling five times weekly.  Plaintiff watched television and listened to

///

3

music.  She needed reminders to clean her home.  Ms. Slavin did not know about Plaintiff's cooking or grocery shopping habits.

　　　　**Medical and Treatment Reports.**  Although Plaintiff's baby died in June 2010, there is no record of her seeking or receiving mental health treatment until November 8, 2010, when she began Pathways to Recovery (Mental Health Track Supported Employment Services), a welfare-to-work program intended to get recipients of public assistance into education or a job.[2]  Phase I (Learning to Manage Your Thinking, Feeling Behavior and/or Substance Use Challenges) was to take ninety days, ending on February 6, 2011.  Phase II (Applying Your Wellness & Recovery Plan at Work or School) was to follow for ninety more days, ending on May 7, 2011.

　　　　As part of the Pathways program, Plaintiff was admitted to treatment with Fresno County Mental Health on November 8, 2010.  Jamie L. Powers, L.M.F.T., prepared the comprehensive intake assessment.  Plaintiff used or abused alcohol, caffeine, nicotine, and cannabis.[3]  She had previously used amphetamines but stopped in 2005.  She complained of hypersomnia during the day and insomnia at night.  Ms. Powers noted symptoms of depression, anxiety, and paranoia, as well as phobias, rituals, and obsessions.  Plaintiff's diagnosis was:

| | |
|---|---|
| Axis I | major depressive disorder (296.32) |
| | panic disorder without agoraphobia (300.01)[4] |
| | obsessive-compulsive disorder (300.3) |
| Axis II | no diagnosis (V71.09) |
| Axis III | arthritis, hernia repair |
| Axis IV | Economic, employment, primary support system, inadequate social support |
| Axis V | GAF 50 (current)  65 (past year) |

　　　　*See* AR 254-255.

*///*

---

[2] Plaintiff testified that the purpose of Pathways was "[t]o get people mentally stable," "[a]nd for therapy.'  AR 44.  She stated, "I lost my son and I ended up there, and I needed help."  AR 44.
[3] Plaintiff testified that she stopped using illegal drugs when her son died, but that her use of cannabis was not illegal since it was prescribed for her.  AR 44-45.  The administrative record includes no documentary support for this testimony.
[4] Since Plaintiff explained that she did not like to leave her apartment in order to avoid certain individuals, Ms. Powers ruled out agoraphobia.

Psychiatrist Richard Guzzetta, M.D., saw Plaintiff at Fresno County Mental Health Services to manage her medications.  On November 17, 2010, her prescriptions included Ambien, Zoloft, MVI, Depo-Provera, and Seroquel SR.  She told Dr. Guzzetta that she had stopped using cannabis. Noting that Plaintiff was experiencing weight gain and excessive sedation ("all she wants to do is sleep"), Dr. Guzzetta substituted Abilify for Seroquel, increased Zoloft, and added Naprosyn for arthritis.  AR 249.  As would be the case at nearly all of her appointments, her mental status was normal, and she was alert, organized, and well-groomed.

Plaintiff did not show for her December 14, 2010 appointment with Dr. Guzzetta.

Following her December 20, 2010 appointment with Ms. Powers, the social worker noted that Plaintiff exhibited poor hygiene, agitation, soft and slow speech, guarded interview behavior, and aggressive behavior.  Plaintiff reported that she was still using cannabis occasionally. Although she was attending the Pathways program, her progress was slow, and her prognosis was poor.

By her December 21, 2010, appointment with Dr. Guzzetta, Plaintiff had begun taking Clonodine, which was helping, although Plaintiff still felt anxious and irritable.

On January 7, 2011, Ms. Power opined that Plaintiff had fair ability[5] to understand, remember, and carry out simple instructions, and to perform activities within a schedule and maintain regular attendance.  She had poor ability[6] to understand, remember, and carry out complex instructions; to maintain concentration, attention, and persistence; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to respond appropriately to changes in a work setting.

When Plaintiff saw Dr. Guzzetta on January 12, 2011, she complained of trouble sleeping and of sores filled with pus all over her body.  When Plaintiff saw Dr. Guzzetta on January 25, 2011,

///

---

[5] For fair ability, "[t]he evidence supports the conclusion that the individual's capacity to perform the activity is impaired, but the degree/extent of the impairment needs to be further described."  AR 262.
[6] For poor ability, "[t]he evidence supports the conclusion that the individual cannot usefully perform or sustain the activity."  AR 262.

she complained that although Trazadone helped her sleep, she did not feel like getting out of bed when she awoke.

In February 2011, orthopedist Theodore Georgis, Jr., M.D., prepared a consultative report for the state agency.  Plaintiff reported neck and back injuries incurred in a 2006 motor vehicle accident, for which she had undergone chiropractic treatment.  Although she described constant, severe pain and numbness of her fingertips, Plaintiff did not experience radiating pain, weakness of her extremities, walking imbalance, or bladder or bowel incontinence.  Her range of motion was generally within normal limits, except for minor reduction of the range of motion of her lumbar spine.  Dr. Georgis observed no evidence of joint pain, swelling, tenderness, or inflammation.  He opined:

> The claimant can lift and carry fifty pounds occasionally and 20 pounds frequently.  The claimant can stand and walk six hours out of an eight-hour day with normal breaks.  The claimant can sit without restriction.  Exertional limitations include frequent stooping, crouching, and crawling.

AR 268.

Stephen Fair, Ph.D., prepared the psychiatric review technique on February 22, 2011.  Dr. Fair found Plaintiff only partially credible.  Noting Plaintiff's ability to conduct various activities of daily living such as housekeeping and child care, he opined that Plaintiff had affective and substance addiction disorders that were not expected to last twelve months, specifically depression, grief reaction, and cannabis abuse.  He concluded that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation.

On the Mental Residual Functional Capacity Assessment, Dr. Fair opined that Plaintiff was moderately limited in the ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and

workweek without interruptions from psychologically based symptoms, and to perform at a

consistent pace without an unreasonable number and length of rest periods; to interact appropriately

with the general public; to accept instructions and respond appropriately to criticism from

supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral

extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards

and take appropriate precautions; and to set realistic goals or make plans independently of others.

Dr. Fair commented:

> The [claimant's therapist] est[imates] the [claimant's] IQ to be within the ave[rage] range, and
> she will be able to understand and remember detailed tasks.
> She will be able to persevere and concentrate on simple, routine work over an extended
> period of time.
> She will be able to interact appropriately with others on a limited basis.
> She will be able to adapt to changes in a simple work environment.

AR 286.

On February 23, 2011, medical consultant K. Quint, M.D., completed the physical residual

functional capacity assessment.  Dr. Quint opined that Plaintiff could lift and carry 50 pounds

occasionally and 25 pounds frequently, and sit, stand, or walk six hours in an eight-hour day.  She

had no other physical limitations.

Plaintiff did not show for her appointment with Dr. Guzzetta on March 8, 2011.  When

Plaintiff saw Dr. Guzzetta on March 29, 2011, she reported that she had stopped taking Cymbalta

because it made her suicidal and sadder ("she was crying seven days a week rather than three").  AR

300.  Dr. Guzzetta prescribed Remeron.

On March 29, 2011, Dr. Guzzetta completed a questionnaire entitled Medical Source

Statement—Psychiatric/Psychological.  He opined that when Plaintiff was stabilized on medication

she was able to relate and interact with supervisors and co-workers and to deal with the public.

Although she had some difficulty concentrating, she could focus for up to thirty minutes at a time

and to understand, remember, and carry out simple one-or-two-step job instructions.  Her impairments arose upon the death of her son and may improve over time.  She is "unable to handle stress—she states her hair falls out."  AR 298.

On April 29, 2011, psychotherapist Richard Morgott, Ph.D., L.M.F.T., of Pathways, signed a Welfare-to-Work exemption form.  By check marks, he indicated that Plaintiff had "a medically verifiable condition that would prevent or limit her from performing certain tasks," and that her limitations prevented her from participating in education or training.  AR 305.  According to Dr. Morgott, her condition was chronic, with an onset date of October 2010, and was expected to last until April 29, 2012.  Although she was "actively seeking treatment," Plaintiff had no scheduled appointments.  AR 305.

On July 27, 2011, Plaintiff sought to resume taking medication at the Urgent Care Wellness Center of Fresno County Behavioral Health.  Plaintiff reported that she had stopped taking Abilify and Remeron two weeks earlier after experiencing a "seizure" in which she blacked out and urinated on herself.  She felt that without medication, her depression was returning.  Robert Holloway, M.D., directed Plaintiff to resume taking Remeron but to postpone taking other medications until her primary care doctor received the results of pending tests.  She was advised to see her doctor as soon as possible.[7]

On August 19, 2011, Plaintiff saw psychiatrist Luyen Luu, M.D., and reported that the Remeron was "not strong enough."  AR 319.  Dr. Luu increased the dosage of Remeron and added Vistaril.

When Plaintiff next saw Dr. Luu on December 30, 2011, she was experiencing an unplanned pregnancy.  She planned an elective abortion since she could not financially or emotionally care for another child, but feared she would "go into deep depression" afterward.  AR 317.

---

[7] The administrative record includes no information regarding the outcome of the testing, and any treatment, associated with the "seizure."

In a plan of care dated January 4, 2012, Patricia Lometti, L.C.S.W., of the Fresno County Department of Behavioral Health, reported that Plaintiff had been depressed, angry, irritable, and sad since her father died when she was 23 years old.  She had nightmares and difficulty sleeping since the death of her son in June 2010.  Although Plaintiff had completed the Pathways program and participated in individual therapy, she was significantly impaired and there was a probability of significant deterioration without assistance and emotional support through her crisis pregnancy.

When Plaintiff saw Dr. Luu on January 27, 2012, she had not yet had the abortion.  She had stopped taking her medication because of nausea and vomiting.

On March 23, 2012, Plaintiff reported to Dr. Luu that she had an elective abortion on February 1.  She subsequently broke up with the baby's father, setting forth multiple reasons for doing so.  Plaintiff complained of difficulty sleeping and anxiety, despite taking Vistaril.  She gave Dr. Luu a Welfare-to-Work exemption form, explaining that if it was not completed, her $490.00 monthly welfare payment would be cut.

**Vocational expert testimony.**  Vocational expert Alan Cummings categorized Plaintiff's past work as telemarketer (DOT No. 299.357-014, sedentary, semi-skilled, SVP 3); door-to-door sales rep (canvasser) (DOT No. 291.357-010, light, unskilled, SVP 2); construction worker I (rain gutter hanger) (DOT No. 869.664.014, heavy, semi-skilled, SVP 4); and fast food manager (DOT No. 185.137-010, light, skilled, SVP 5).  Cummings categorized Plaintiff's prior work of slot floor supervisor as money room supervisor (DOT No. 211.137-018, light, skilled, SVP 6), although as actually performed, it was more appropriately classified as SVP 5, medium to heavy.  Her prior work as a fast food worker (DOT No. 311.472-010, light, unskilled SVP2), was actually performed as medium to heavy.  In Cumming's opinion, none of Plaintiff's past jobs resulted in transferable skills.

For the first hypothetical question, the ALJ directed Cummings to assume a hypothetical person of the same age, education, and work experience as Plaintiff, with the residual functional capacity to perform work at all exertional levels except that the work must be limited to simple,

routine, repetitive tasks and only occasional interaction with the public.  Cummings opined that the first hypothetical person could not perform any of Plaintiff's prior work.  The first hypothetical person could work as a packager (DOT No. 920.587-018, medium, unskilled, SVP 2), with 93,000 jobs in California and 676,000 jobs nationally; cleaner (DOT No. 381.687-018, medium, unskilled, SVP 2) with 201,000 jobs in California, 2 million jobs nationally; or inspector (DOT 727.687-066, light, unskilled, SVP 2) with 47,000 jobs in California, 410,000 nationally.

For the second hypothetical question, the ALJ directed Cummings to assume a hypothetical person of the same age, education, and work experience as Plaintiff, with the residual functional capacity to perform work at all exertional levels, except that, due to a combination of mental impairments associated with anxiety and depression, she was unable to engage in sustained work activity for a full eight-hour day on a regular and consistent basis.  Cummings opined that such a person could not perform any of Plaintiff's prior jobs and that there would not be any other jobs available for such a person.

## III.   **Discussion**

### A.   **Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant

is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### B.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. See 42 U.S.C. § 423(d)(2)(A); *Tackett v. Apfel*,  180 F.3d 1094, 1098 (9th Cir. 1999).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Id.*

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520; 416.920.  The process requires consideration of the following questions:

Step one:      Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:      Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:      Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:      Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:      Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).  If a claimant is found "disabled" or "not disabled" at any step, the remaining steps need not be addressed.  *Tackett*, 180 F.3d at 1098.

At steps one through four, the claimant bears the burden of proof, subject to the presumed nonadversarial nature of Social Security hearings and the Commissioner's affirmative duty to assist claimants in developing the record whether or not they are represented by counsel. *Tackett*, 180 F.3d at 1098 n. 3; *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). If the first four steps are adequately proven, the burden shifts to the Commissioner to prove at step five that considering the claimant's residual functional capacity, age, education, and work experience, he or she can perform other work that is available in significant numbers. *Tackett*, 180 F.3d at 1098; *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 15, 2009. Her severe impairments were major depressive and anxiety disorder. Neither of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). Plaintiff had the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations: she could perform simple, routine, and repetitive tasks with only occasional interaction with the public. As a result, Plaintiff was unable to perform any of her past relevant work. Nonetheless, considering Plaintiff's age, education, work experience, and residual functional capacity, she could perform other jobs that exist in significant numbers in the national economy.

## C.   Failure to Credit Opinion of Treating Physician

Plaintiff contends that because the Commissioner failed to support her rejection of Dr. Guzzetta's opinions with substantial evidence and failed to consider the opinions of Drs. Fair and Goldberg, the Court must reverse and remand the case for payment of benefits. Asserting that the ALJ misread the record, picking and choosing evidence to support her opinion, Plaintiff specifically contends (1) that because Drs. Guzzetta, Fair, and Goldberg each opined that Plaintiff's severe impairments would not exceed twelve months, the ALJ erred in failing to determine whether

12

Plaintiff's condition had improved within twelve months, and (2) that Drs. Guzzetta, Fair, and Goldberg all agreed that Plaintiff "lacked the ability to engage in substantial gainful activity ."  Doc. 13 at 12.

Not surprisingly, the Commissioner disagrees, contending that the ALJ properly weighed the opinion evidence to correctly assess Plaintiff's residual functional capacity.  Having reviewed the record as a whole and applicable law, the Court concludes that because the ALJ's opinion was supported by substantial evidence, it cannot adopt the alternative interpretation of the evidence that Plaintiff favors.

### 1. __Medical Evidence and Opinions__

A review of the various medical opinions in this case and the time line on which they were provided is helpful in evaluating Plaintiff's contentions.  The regulations (20 C.F.R. § 404.1513(a)) identify physicians and psychologists, among others, as acceptable medical sources of impairment. Other sources, including therapists and the personnel of social service agencies, among others, may also provide evidence regarding the severity of a claimant's impairments and their effect on the claimant's ability to work.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] not treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-treating physician. *Id.*

Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick*, 157 F.3d at 725.  "An ALJ is not bound by an expert medical opinion

on the ultimate question of disability." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); S.S.R. 96-5p.

Although Plaintiff's application for benefits alleged that her disability began December 18, 2007, and the hearing decision stated that her serious impairments began September 15, 2009, the reasons for those dates are unclear.  Although Plaintiff's medical records noted that she became depressed following the death of her infant son in June 2010, the administrative record includes no medical reports dated before November 8, 2010.  Plaintiff applied for disability benefits on November 23, 2010.

The administrative record in this case includes mental health treatment records and opinions associated with three distinct situations: (1) Plaintiff's participation in the Pathways program, (2) adjustment of Plaintiff's medication following her July 27, 2011 "seizure," and (3) Plaintiff's unplanned pregnancy.  In conjunction with Pathways, Dr. Guzzetta, a psychiatrist, supervised Plaintiff's medications from November 8, 2010 to March 29, 2011; Ms. Powers, a licensed marital and family therapist, treated Plaintiff from November 8, 2010 through January 25, 2011.[8]  Although both Dr. Guzzetta and Ms. Powers treated Plaintiff, only Dr. Guzzetta is an acceptable medical source under 20 C.F.R. § 404.1513(a).  Dr. Guzzetta prepared a medical source statement on March 29, 2011.

Dr. Fair, a non-treating psychologist, prepared the psychiatric review technique and mental residual functional capacity analysis on February 22, 2011.  Although Dr. Morgott prepared the Calworks welfare-to-work exemption form on April 29, 2011, nothing in the record indicates that he ever treated or examined Plaintiff.  On June 14, 2011, agency psychologist Alan Goldberg, Psy.D., signed a case analysis which ordered adoption of the initial agency decision to deny benefits.

---

[8]   The treatment dates roughly correspond to the time period during which Plaintiff participated in the Pathways program.  Plaintiff did not see either Dr. Guzzetta or Ms. Powers thereafter.

14

There is no record of Plaintiff's receiving mental health treatment from her April 5, 2011 appointment with Dr. Guzzetta until July 27, 2011, when Plaintiff went to the urgent care department of Fresno County Behavioral Health, reporting that she had stopped using her medications after she experienced a "seizure" two weeks earlier.  Dr. Holloway treated Plaintiff there, advising her to resume Remeron and to see her physician.  On August 19, 2011, Plaintiff saw Dr. Luu, who adjusted Plaintiff's medications.

Following the August appointment, there is no record of mental health treatment until December 30, 2011, when Plaintiff saw Dr. Luu and reported an unplanned pregnancy.  Dr. Luu and Ms. Lometti, a clinical social worker, treated Plaintiff until March 23, 2012.  Dr. Luu is a treating physician.  The record includes no later treatment records.  (At the administrative hearing on May 22, 2012, Plaintiff testified that she was seeing Dr. Luu every three months regarding her medications and that she saw a therapist twice monthly.)

The Social Security Administration favors the opinion of a treating physician over that of non-treating physicians.  20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, despite Plaintiff's arguments to the contrary, a treating physician's opinion is not conclusive as to either a physical or mental condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of the medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record and (2) clinical findings support the opinions.  The ALJ may reject an *uncontradicted* opinion of a treating or examining physician only for clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the treating

physician's opinion is generally given greater weight, when it is contradicted by an examining

physician's opinion that is supported by different clinical findings, the ALJ may resolve the conflict.

An ALJ must determine a claimant's residual functional capacity based on "all relevant

evidence in the record." *Valentine v. Commissioner Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir.

2009).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical

evidence, interpret the evidence, and make a finding. *Magallanes*, 881 F.2d at 751-55.  The ALJ

need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v.

Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.  Although an ALJ is not

bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of

disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons

for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  The ALJ must tie the

objective factors of the record as a whole to the opinions and findings that he or she rejects. *Embrey

v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

### 2.     The ALJ's Analysis

In determining Plaintiff's residual functional capacity, the ALJ appropriately considered the

record as a whole, addressing the credibility of Plaintiff and of her grandmother, Ms. Slavin, as well

as the reports and opinions of treating and agency physicians.  The ALJ began her analysis by

accurately noting that Plaintiff had "received limited treatment since October 2010 for depression,

anxiety, and bereavement," including participation in the Pathways to Recovery Program (mental

health track).  AR 19.  She gave little weight to Ms. Slaven's third-party statement, noting that her

opinions were "generally vague and unquantified."  AR 19.[9]  The ALJ also found Plaintiff to lack

credibility:

> The claimant's allegations are not fully credible.  The claimant has received
> limited treatment.  The claimant showed significant improvement with treatment

---

[9] The ALJ did not comment on the surprising inconsistency of the adult function reports completed by Plaintiff and Ms. Slavin.  For example, Plaintiff said she shopped for groceries with Ms. Slavin; Ms. Slavin claimed to be unaware of Plaintiff's grocery shopping habits.

and medication.  There was no period of 12 months or longer with greater than the above-cited limitations.  The claimant has an inconsistent work history.

AR 20.

The ALJ addressed the notes and opinions of all acceptable medical sources included within the administrative record:

There is an April 2011 statement from Richard Morgott, Ph.D., indicating that the claimant is unable to work.  This statement is not in the form of a residual functional capacity, but in any case is inconsistent with the medical record and has been given little weight.  In March 2011, treating psychiatrist Richard Guzzetta, M.D., stated the claimant was able to perform simple and repetitive tasks and was fully able to interact with supervisors, co-workers, and the public when stable on medication.  He opined that she was able to hand[le] funds.  She was able to focus for 30 minutes at a time.  However, he opined she was unable to handle stress.  She had no side effects from medication.  This statement is inconsistent with the medical record and normal mental status examinations.  Dr. Guzzetta noted that the claimant had normal cognition, normal thought content, normal mood, and organized thought processes.  In July 2011, treating psychiatrist Robert Holloway, M.D., noted normal cognition, normal thought content, and organized thought processes.  The client had a depressed and anxious mood.  In December 2011, the claimant was planning to terminate a pregnancy and treating psychiatrist Luyen Luu, M.D., noted abnormal findings of disheveled appearance, motor retardation, and labile effect.  Significantly, in January 2012, the claimant's mental status examination was generally normal.  The claimant was noted to be better since she was medication compliant.

AR 20 (*citations to record omitted*).

The ALJ ended her analysis by summarizing the agency's determination:

The State agency determined the claimant could perform simple and routine work on a consistent basis and could interact with others on a limited basis.  This opinion has been given substantial weight because it is consistent with the medical record and overall evidence of record.

AR 21 (*citations to record omitted*).

///

///

///

///

///

17

1

2

3   **3.   Expected Duration of Plaintiff's Impairments**

4   Charging that the ALJ "misread the medical evidence as a whole," Plaintiff emphasizes that

5   Drs. Guzzetta, Fair, and Gold[berg][10] all projected that her limitations would not persist for longer

6   than twelve months.  The ALJ, maintains Plaintiff, never addressed "whether Plaintiff ever got

7   better."  Doc. 13 at 12.  The Court disagrees.

8   The ALJ's evaluation of the duration of Plaintiff's impairments is set forth in her assessment

9   of Plaintiff's credibility:

10   > The claimant has received limited treatment.  The claimant showed significant
   > improvement with treatment and medication.  There was no period of 12 months
11   > or longer with greater than the above-cited limitations.

12   AR 20.

13   Further details appear within the paragraph addressing the treating physician's opinions.  By

14   the end of the Pathways program in March 2011, Dr. Guzzetta opined that Plaintiff was able to

15   perform simple and repetitive tasks, and to interact fully with supervisors, co-workers, and the public

16   when stabilized on medication.  She could handle funds, and focus for thirty minutes at a time.  Dr.

17   Guzzetta repeatedly noted normal mental status examinations, with normal cognition, thought

18   content, and mood, and organized thought processes.  Illustrating the success of the medication

19   regimen, after her participation in Pathways ended in March, Plaintiff received no regular mental

20   health treatment except quarterly appointments for psychiatric supervision of her medication until

21   July 2011, when she went off her medications following the blackout that she described as a seizure.

22   As the Court reads the hearing decision, the ALJ accepted and relied on Dr. Guzzetta's

23   opinion except for his statements on anxiety and side effects.  The decision contrasts these

24   statements with the balance of Dr. Guzzetta's opinion: "*However*, he opined she was unable to

25

26

27   ---

   [10] The Court would not typically consider Dr. Goldberg's summary adoption of the agency recommendations to
28   constitute a medical opinion.  Since the Commissioner does not contest Plaintiff's characterization of Dr.Goldberg's case
   analysis note as an opinion, however, the Court includes Dr. Goldberg's adoption of the agency assessment in this
   discussion.

handle stress.  She had no side effects from medication.  This statement is inconsistent with the medical record and normal mental status examinations."  AR 20 (*emphasis added*) (*citation to record omitted*).  As the Commissioner points out, Dr. Guzzetta based his conclusion that Plaintiff experienced anxiety on her representations that her hair loss was attributable to anxiety.  No evidence in the record, other than Plaintiff's own representations, supports a conclusion that anxiety caused Plaintiff to lose her hair.  In fact, there is no evidence that Plaintiff ever sought any medical advice or treatment concerning her reported hair loss.  The ALJ may appropriately reject a physician's opinion that does no more than repeat the claimant's own representations. *Tommasetti*, 533 F.3d at 1041.

The inconsistency of the statement that Plaintiff experienced no side effects from medication is apparent in her July 2011 "seizure," which may have related to one of Plaintiff's medications[11] since Plaintiff discontinued taking them until she saw urgent care psychiatrist Dr. Holloway, complaining of increased depression and anxiety since she stopped her medications.  Notably, Dr. Holloway advised Plaintiff to resume taking only Remeron until she was able to see her own physician.  When Plaintiff finally saw Dr. Luu in August 2011, Dr. Luu modified Plaintiff's medication regimen.  Following the changes in medication, Plaintiff did not seek treatment again until she became unexpectedly pregnant in December 2010.  But by the next month (January 2011), Plaintiff was noted to be better after again becoming compliant with her medications.

The course of Plaintiff's treatment and functioning is consistent with the opinions of Drs. Guzzetta, Fair, and Goldberg that her fall 2010 impairments would not extend for twelve months. That Plaintiff had an isolated medication-related setback in July 2011 and struggled with an unplanned pregnancy in December 2011 did not render Plaintiff "unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted

---

[11] Although the record does not include the results of the testing to which Plaintiff referred in her appointment with Dr. Holloway, the ALJ appropriately drew conclusions supported by the evidence in the record.

or can be expected to last for a continuous period of not less than twelve months."  Nor do these discrete incidents support a conclusion that Plaintiff was chronically ill and unable to function.

### 4.    Ability to Engage in Substantial Gainful Activity

Nonetheless, Plaintiff argues that her depression is recurrent and that the Drs. Guzzetta, Fair, and Goldberg agreed "that [Plaintiff] lacked the ability to engage in substantial gainful activity." Doc. 13 at 12.  Having reviewed the portions of the record on which Plaintiff relied in contending that Drs. Guzzetta, Fair, and Goldberg agreed that she was unable to work (AR 251, 270-286, 297-298, 305, 309, 310, and 312), the Court rejects her argument, finding that the cited portions of the record do not support a conclusion that all three doctors deemed Plaintiff unable to work.  *See* AR 251 (single page of November 8, 2010 intake interview with Ms. Powers, indicating Plaintiff's mental health history and subjective complaints upon Pathways intake); AR 270-286 (Dr. Fair's psychiatric review technique and mental residual functional capacity, which concluded that Plaintiff's impairments would not persist to November 8, 2011); AR 297 (Dr. Guzzetta's medical source statement, which sets forth Plaintiff's abilities and impairments); AR 305 (Dr. Morgott's welfare-to-work exemption endorsement); AR 309 (Dr. Goldberg's two-sentence adoption of the agency's assessment that Plaintiff did not qualify for disability benefits); AR 310 (Ms. Lometti's plan of care, dated January 4, 2012, indicating treatment objective is "[t]o obtain assistance and emotional support through my crisis pregnancy"; AR 312 (Dr. Luu's March 23, 2012 medication progress note, reciting Plaintiff's complaint that Vistaril was ineffective on insomnia and anxiety and that doctor must complete welfare-to-work exemption form lest her benefits be reduced).

Even if the evidence is accepted as supporting Plaintiff's preferred outcome, this Court's role is not to substitute its evaluation of the evidence for the ALJ's evaluation.  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).  Questions of credibility and resolution of conflicts in the evidence are reserved solely to the Commissioner.  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th

20

Cir. 2006).  If the ALJ interpreted the claimant's testimony reasonably and his determination is

supported by substantial evidence, the Court may not substitute an alternative interpretation.  *Rollins*

*v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).  Substantial evidence and proper legal reasoning

supported the ALJ's conclusion that despite Plaintiff's serious impairments, she was able to perform

substantial gainful activity.

### 5.    Duty to Develop Record

Finally, Plaintiff contends that the ALJ erred in failing to order a consultative examination to

determine the state of her impairments at the time of the hearing decision.  The Commissioner and

the Court disagree.

"While it is true that a social security disability hearing is not adversarial, that does not

remove the burden of proof of disability from the claimant."  *Banuelos v. Chater*, 1996 WL 681261

at *1 (9th Cir. Nov. 22, 1996) (No. 95-55787).  A claimant of social security disability benefits bears

the burden of proving that he or she is unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall not be considered to be under a disability

unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of

Social Security may require."  42 U.S.C. § 423(d)(5)(A).  The regulations clearly state, "We will

consider only impairment(s) you say you have or about which we receive evidence."  20 C.F.R. §

404.1512(a).

Despite the claimant's burden of proof, the Commissioner must consider all evidence

available in the claimant's record and must develop a complete medical history for at least the twelve

months prior to the determination that the individual is not disabled.  42 U.S.C. § 423(d)(5)(B).  In

doing this, the Commissioner must "make every reasonable effort" to obtain all necessary medical

evidence from the claimant's treating physicians or other health care providers.  *Id.*  The Commissioner did so here.

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Id.* at 459-60.  Here, the record was more than adequate to permit the ALJ to determine that Plaintiff's depression and anxiety had improved with treatment and consistent use of medication.

**IV.      Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **April 8, 2015**                           **/s/ Sandra M. Snyder**
                                                  UNITED STATES MAGISTRATE JUDGE